NEW VALLEY CORPORATION,
Plaintiff,

v.

The UNITED STATES, Defendant.

No. 94–785C.

United States Court of Federal Claims.

Jan. 5, 1996.

Sarah S. Gold, New York City, for plaintiff.

Geoffrey C. Cook, Washington, DC, with whom was Frank W. Hunger, Assistant Attorney General, for defendant.

*Amended and Corrected Opinion and Order*[1]

WEINSTEIN, Judge.

Plaintiff seeks damages, for breach of contract or a taking, arising from the government's failure to launch a commercial payload due to revisions to the nation's space policy following the shuttle "Challenger" disaster. Defendant has moved to dismiss this action because plaintiff did not exhaust the contractual administrative disputes process, or, in the alternative, because plaintiff contractually waived all claims for non-performance. After oral argument, defendant's motion to dismiss is granted.

1. This order originally was issued on December 29, 1995. It is hereby amended to correct typographical and other errors, and to add a footnote, n. 8.

2. The court assumes for purposes of this motion that the LSA is in fact an enforceable "contract" for the provision of goods or services, and thus a contract covered by the Tucker Act. Its terms, however, particularly Article V, making the contract terminable at will, and the joint purpose—of furthering the exploration of space—suggest that the LSA may be merely a "cooperative agreement," rather than a "contract" under 31 U.S.C. §§ 6303, 6305, and, thus may not be a contract as to which Congress has waived its sovereign immunity to suit in this court under the Tucker Act, 28 U.S.C. § 1491(a)(1). 31 U.S.C. § 6305 provides that an executive agency shall use a cooperative agreement as the legal

*Facts*

The National Aeronautics and Space Administration ("NASA") began providing commercial satellite launch services on the space shuttle in 1981. Complaint ("Comp.") ¶ 12. In January 1984, plaintiff New Valley Corporation (then known as the Western Union Telegraph Company, but referred to herein in both capacities as "NVC") entered into a Launch Services Agreement ("LSA"),[2] with NASA under which NASA would use its "best efforts" to furnish launch and associated services for NVC's communications satellites Westar VI and Westar VII (later renamed Westar VI–S) on the space shuttle. The LSA was to remain in effect until September 1995 or until both satellites were launched, whichever came first. Comp. ¶ 16; Comp. Ex. A at II–4 to –5.

From 1981 to 1986, NASA flew numerous successful shuttle missions carrying commercial payloads, including the mission launching Westar VI. Comp. ¶¶ 12, 15. Westar VI–S was assigned a "Firm Launch Date" of March 6, 1986. Comp. ¶ 18. On January 24, 1986, the LSA was amended to provide a June 1986 launch date. *Id.* Four days later, on January 28, 1986, tragically, the shuttle Challenger was destroyed shortly after launch. Comp. ¶ 28.

A presidential commission formed to investigate the Challenger accident concluded that the press of NASA's commercial responsibilities was at least partly responsible for the improper decision to launch the Challenger. Comp. ¶ 29. On August 15, 1986, the Presi-

instrument between a state, a local government, or other recipient when "(1) the principal purpose of the relationship is to transfer a thing of value to the ... recipient to carry out a public purpose of support or stimulation ... instead of acquiring ... property or services for the direct benefit or use of the United States Government; and (2) substantial involvement is expected between the agency and the ... recipient when carrying out the activity contemplated by the agreement." *See generally Dixson v. United States,* 465 U.S. 482, 506–509, 104 S.Ct. 1172, 1185–1187, 79 L.Ed.2d 458 (1984) (O'Connor, J., dissenting); *Chem Serv., Inc. v. Environmental Monitoring Sys. Lab.–Cincinnati,* 12 F.3d 1256, 1265–66 (3rd Cir.1993); *Trauma Serv. Group, Ltd. v. United States,* 33 Fed.Cl. 426, 429–30 (1995).

dent issued a statement announcing that "NASA will no longer be in the business of launching private satellites," because this interfered with the development of United States private industry's capacity to provide commercial launch services. Comp. ¶ 39; Statement by the President, 22 Weekly Comp.Pres.Doc. 1103, 1104 (Aug. 15, 1986). At that time, forty-four commercial payloads containing satellites, including Westar VI–S, were·scheduled for launch under arrangements similar to the LSA. Comp. ¶ 40 (citing White House Press Briefing (Aug. 15, 1986)).

Thereafter, the President received recommendations from the Working Group on Commercial Space of the President's Economic Policy Council ("Space Working Group"), composed of, among others, the Departments of Commerce, Transportation, and Defense, and the Office of Management and Budget. Comp. ¶¶ 34–35, 41; *see Hughes Communications Galaxy, Inc. v. United States,* 26 Cl.Ct. 123, 131 n. 10 (1992), *rev'd on other grounds,* 998 F.2d 953 (Fed.Cir. 1993). On September 25, 1986, the President's Cabinet Secretary informed NASA that the President had accepted the Working Group's recommendation not to launch any more private satellites, except those requiring launch from a manned vehicle, or having national security or foreign policy implications. Comp. ¶ 42; *see Hughes Communications Galaxy, Inc.,* 26 Cl.Ct. at 132.

On October 3, 1986, NASA's Associate Administrator for Space Flight informed NVC by telex that the new shuttle manifest included only such satellites, and that the Westar VI–S did not qualify for any exception to the ban on private satellites. Comp. Ex. C at 2. An October 30 letter from NASA's General Manager to NVC stated,

> This manifest, which reflects current White House policy and represents NASA's judgment on how best to satisfy launch requirements, which far exceed current capacity, outlines the launch schedule through calendar year 1994. Unfortunate-

ly, within the priorities from which we have developed this manifest, it has not been possible to set a launch date for [Westar VI–S].

> It appears almost certain that you will not be provided launch services either prior to or after your current contract expires in September 1995. . . .

> I wish to express our regret at having to inform you of our inability to accommodate your payload.

Comp. ¶ 48.

On January 21, 1987, NVC representatives met with NASA representatives to discuss NVC's claim for compensation for losses caused by NASA's failure to launch Westar VI–S. Comp. ¶ 57; Pl.Opp. Ex. H at 1. NVC's follow-up letter to the General Manager provided a written schedule of the costs (including indirect damages) to be recovered, totalling $38,596,964.[3] Pl.Opp. Ex. H at 3; *see id.* at 1 ("As agreed, I am attaching a sheet listing some of these losses."). In March 1987, NASA agreed to refund $4,783,-264 in progress payments and earnest money. Comp. ¶ 58; Pl.Opp. Exs. K, L. Each party expressly reserved "any and all claims or rights it may have with respect to damages arising from the LSA." Comp. ¶ 58.

In May 1988, NVC sold Westar VI–S to Hughes Communications Galaxy, Inc. Comp. ¶ 54, Exhibit F. It was launched commercially by Arianespace in October 1990. Comp. Ex. E at 1.

Seven years after the refund, on March 24, 1994, NVC wrote NASA demanding additional, unspecified and unquantified, damages. Comp. Ex. D. (It remains unclear whether the damages demanded by NVC in 1987 were diminished by the sale of Westar VI–S to Hughes.) NASA's April 14 response noted that NVC's receipt of a refund and its sale of Westar VI–S to Hughes raised questions of whether NVC had violated the anti-assignment clause of the LSA, Comp. Ex. A at VIII–1; *see also* Anti–Assignment Act, 31

---

**3.** The listed costs were $4,783,264 in payments to NASA for the launch of Westar VI–S and reservation fees for future launches, $12,063,700 that NVC had spent preparing Westar VI–S for launch on the shuttle, $29,750,000 in increased

launch expenses (including modifications to the satellite and increased insurance costs), and $12,000,000 for "Loss of Capital Investment." Pl.Opp. Ex. H at 3.

U.S.C. § 3727, or was entitled to the full measure of damages claimed in 1987. Comp. Ex. E. Nevertheless, while it believed there was no "basis for a ... damage claim," NASA agreed to review NVC's claim under the LSA disputes clause. *Id.*

On May 24, 1994, NVC wrote that it had not surrendered its claim to Hughes, but again did not specify or quantify the damages currently claimed, or the contractual basis for them. Comp. Ex. F. On August 3, NVC wrote the NASA Administrator, stating that, unless NASA quickly arranged to meet and discuss resolution of the March letter, NVC would consider the 60–day disputes procedures prescribed by Article XVIII of the LSA to have been exhausted. Comp. Ex. G. Again, however, no claim for specified damages, or any support for such a claim, was provided.

In October 1994, NVC filed suit claiming a breach of contract and the taking of property without just compensation, asserting damages of thirty million dollars, including the lost revenue from its sale of Westar VI–S, "reconfiguration costs," expenses and expenditures unreimbursed by NASA, and "increased launch support services and insurance costs." Comp. ¶ 52.

Defendant has moved to dismiss the complaint for failure to state a claim because plaintiff did not exhaust the contract's disputes process. Alternatively, defendant contends that the termination and limitation of damages provisions of the LSA bar plaintiff's claims for damages.

### The LSA

As noted by the Federal Circuit in a case involving an LSA identical in all material respects to the NVC LSA:

> Pursuant to the LSA, NASA agreed to use its "best efforts" to launch [NVC's] com-

mercial satellites through its Space Shuttle program.... The United States government was then promoting commercial use of its shuttle fleet by private industry to offset the costs of its space program.... NASA actively marketed its shuttles as launch vehicles for commercial payloads to both domestic and foreign users.

> The contract ... was, as the Claims Court recognized, unique.

*Hughes Communications Galaxy, Inc. v. United States,* 998 F.2d 953, 955 (Fed.Cir. 1993) (footnote omitted). The provisions of the LSA that are relevant to this dispute are described below.

In Article V, "Allocation of Certain Risks," the parties, recognizing their common goal of furthering space exploration, agreed to a full, no-fault, mutual waiver of liability, and mutually agreed not to sue or bring a damage claim against one another, irrespective of who caused the damage or how (even if it arose from "negligence or otherwise"):

> NASA and the Customer (the parties) will respectively utilize their property and employees in STS [Space Transportation System] Operations in close proximity to one another and to others. Furthermore, the parties recognize that all participants in STS Operations are engaged in the common goal of meaningful exploration, exploitation and uses of outer space. In furtherance of this goal, the parties hereto agree to a no-fault, no-subrogation, inter-party waiver of liability pursuant to which *each party agrees not to bring a claim against or sue the other* party or other customers and agrees to absorb the financial and any other consequences for Damage [4] it incurs to its own property and employees as a result of participation in STS Operations during Protected STS Operations [*i.e.,* the physical operations of transporting, pre-

---

**4.** "Damage" was defined as "bodily injury to or death of *any* person, damage to or loss of *any* property, and *loss of revenue or profits* or other *direct, indirect or consequential damages* arising therefrom," Comp. Ex. A at V–1 (emphasis added). (This court respectfully declines to follow the opinion, expressed by this court in *Transpace Carriers, Inc. v. United States,* 27 Fed.Cl. 269, 273 (1992), that this contractual definition of "Damage" itself precludes recovery of lost revenue and

other consequences of a failure to complete a contract, that court not explaining why its interpretation of the contract ignored the specific damage limitations in Article V.) As noted *infra,* however, in addition to barring "claim[s]" (presumptively including judicial claims) for "Damage," as defined in the LSA, paragraph 4 of Article V also barred claims for *"other relief"* for delay or non-performance.

paring, and launching the satellite, Comp. Ex. A at V–7 to –8], irrespective of whether such Damage is caused by NASA, the Customer, or other customers participating in STS Operations, and *regardless of whether such Damage arises through negligence or otherwise.* Thus, the parties, by absorbing the consequences of damage to their property and employees *without recourse* against each other or other customers participating in STS Operations during Protected STS Operations, jointly contribute to the common goal of meaningful exploration of outer space.

Comp. Ex. A at V–8 to –9 (emphasis added).

The parties also agreed to extend the inter-party waiver of liability to all participants—to subcontractors at every tier participating in STS operations, to assignees, and to other customers. Comp. Ex. A at V–9. Moreover, this inter-party waiver was expressly to "be broadly construed to achieve the intended objectives [joint space exploration]." Comp. Ex. A at V–10.

Paragraph 4 of Article V specifically precluded NVC from recovering *any* type of damages due to any type of breach of the LSA—*i.e.,* delay, non-performance, or improper performance of launch services by the United States or by any of its contractors or subcontractors:

> Without affecting the right of the Customer to pursue the Disputes provision set forth in Article XVIII of this Agreement, *the Customer shall not make any claim against the United States Government* or the United States Government's contractors and subcontractors *for Damage or other relief for any delay* (including a Deferral, Delay, Suspension or Postponement) in the provision of any Launch and Associated Services *or for the non-performance or improper performance of Launch and Associated Services,* including, but not limited to, the performance by the United States Government or the United States Government's contractors and subcontractors of research, design, development, test, manufacture, assembly, integration, transportation or use of any materials related to STS Operations or in the performance of other services related to STS Operations. . . .

Comp. Ex. A at V–11 to –12 (emphasis added).

The LSA sets out only three exceptions to this prohibition on claims against the government: claims "for such costs or liquidated damages that may be payable as expressly provided for in the [other] contracts entered into by the United States Government and its contractors and subcontractors for services performed for the Customer," claims "against the United States Government or its contractors and subcontractors if such Customer suffers Damage caused by failure of the United States Government or its contractors and subcontractors to fulfill their obligation to incorporate Paragraph 3. above [the mutual waiver of liability], or its equivalent, in an Agreement, Arrangement or Contract, as provided for in Paragraph 3. above," and "claims . . . against the United States Government if such Customer suffers Damage by failure of the United States Government or its contractors and subcontractors to fulfill their obligation to protect Customer data as specified in Article XI of this Agreement. . . ." Comp. Ex. A at V–12. None of these exceptions is applicable to plaintiff's claim.

■ Article V of the LSA expressly, mutually limited the parties' liability for damages not dealt with expressly in the LSA to *direct damages only* (no lost profits, or indirect or consequential damages):

> Notwithstanding Subparagraph 1.b.(2) above [defining "Damage"], to the extent that a risk of Damage is not dealt with expressly in this Agreement, the United States Government's liability to the Customer, and the Customer's liability to the United States Government arising out of this Agreement, whether or not arising as a result of an alleged breach of this Agreement, *shall be limited to direct damages only and shall not include any loss of revenue, profits or other indirect or consequential damages.*

Comp. Ex. A at V–14 (emphasis added).[5]

No other provision of the LSA provides for indirect or consequential damages for breach of the LSA by the government.

Under Article VII, NASA had the right to terminate the LSA,[6] not only upon an official declaration of war or national emergency, or insufficient congressional appropriations, but also "upon a determination in writing that NASA is required to Terminate such services for *Reasons Beyond NASA's Control.*" Comp. Ex. A at VII–1 (emphasis added). Upon such termination, NASA was to refund NVC's progress payments and earnest money, less NASA's incurred costs. Comp. Ex. A at VII–2. Article XX defined "Reasons Beyond NASA's Control" to include "*acts of the United States Government other than NASA,* in either its sovereign or contractual capacity." Comp. Ex. A at XX–5 (emphasis added).

The only contractual recourse for resolving a breach of the LSA, or any difference of opinion regarding whether a breach had occurred, or any determination pursuant to the agreement,[7] was set out in Article XVIII of the LSA's disputes clause:

> Any dispute, whether or not involving an alleged breach of this Agreement, concerning a question of fact or of law arising under this Agreement, which is not disposed of by agreement, shall be reviewed by the NASA Associate Administrator for Space Flight, who shall attempt to resolve the dispute. If the attempt of the NASA Associate Administrator for Space Flight is not successful within sixty days after written submission to him, either party may mail or otherwise furnish a written appeal addressed to the NASA Administrator and the President, or other appropriate official, of the Customer. The *joint decision* of the NASA Administrator and the President, or other appropriate official, of the Customer, or their duly authorized representatives for the determination of such appeal, shall be *final and conclusive. . . .*

Comp. Ex. A at XVIII–1 (emphasis added).

### Discussion

Defendant argues, and the court agrees, that plaintiff's claim for termination damages must be dismissed for failure to exhaust its administrative remedies as set out in the LSA. Also, termination by the government, based on the President's 1986 launch policy, is a "Reason Beyond NASA's Control," limiting plaintiff's damages to the refund of progress payments and earnest money, less NASA's incurred costs. NVC already has received a refund of its progress payments and earnest money. The court also concludes that plaintiff's claim for breach of contract based on NASA's delay in performing, or non-performance of, the LSA, was contractually waived in Article V, paragraph 4. Finally, Article V of the LSA bars plaintiff's claim for indirect or consequential damages.

### Exhaustion of Remedies

■ When parties contractually have agreed to a specified administrative disputes resolution process, courts generally have held

---

5. Indirect and consequential damages, including profits lost on an unrelated contract, generally are not awardable in breach of contract claims brought before this court. *See Kurz & Root Co. v. United States,* 227 Ct.Cl. 522, 531 (1981); *Northern Helex Co. v. United States,* 524 F.2d 707, 720–21, 207 Ct.Cl. 862 (1975), *cert. denied,* 429 U.S. 866, 97 S.Ct. 176, 50 L.Ed.2d 146 (1976).

6. The LSA gave NVC an even broader, virtually unqualified, right to terminate than NASA, permitting NVC to terminate in whole or in part at any time, merely by giving NASA written notice. If the termination was due to a launch delay by NASA, the refund amount was to be the same as if NASA had terminated the LSA. If NVC terminated other than because of a launch delay, *i.e.,* for NVC's convenience, however, NASA was permitted to retain a larger portion of NVC's progress payments. Comp. Ex. A at VII–3 to –7; *see also id.* at XIV–1 ("It is recognized that the Customer has the right to Terminate this Agreement for any reason, but subject to the provisions of Article VII, paragraph 2. of this Agreement.").

7. Article I stated,

> NASA will be required to make determinations pursuant to this Agreement which may affect the Customer. Although certain determinations will require prompt action by NASA and/or the Customer, all such determinations *shall* be subject to the Disputes provision set forth in Article XVIII of this Agreement.

Comp. Ex. A at I–3.

them to the terms of such agreements, and required them to exhaust that disputes process before seeking judicial relief, *see Crown Coat Front Co. v. United States,* 386 U.S. 503, 512–13, 87 S.Ct. 1177, 1182–83, 18 L.Ed.2d 256 (1967), in the absence of clear evidence that the appeal procedure is inadequate or unavailable, *United States v. Blair,* 321 U.S. 730, 735, 64 S.Ct. 820, 822–23, 88 L.Ed. 1039 (1944) ("Having accepted and agreed to [an appeals process], respondent was not free to disregard [it] without due cause, accumulate large damages and then sue for recovery in the Court of Claims. Nor can the Government be so easily deprived of the administrative machinery it has created to adjudicate disputes and to avoid large damage claims."). Futility cannot be based on a bald assertion of bad faith by government officials, since they are presumed to act in good faith. *See Shermco Indus. v. United States,* 231 Ct.Cl. 1025, 1027 (1982). Dismissal for failure to exhaust a contractual dispute procedure is dismissal for failure to state a claim. *Lucas v. United States,* 25 Cl.Ct. 298, 307 n. 8 (1992); *Omni Moving & Storage, Inc. v. United States,* 21 Cl.Ct. 224, 230 (1990).

None of NVC's submissions to NASA satisfied the requirements of the contract's disputes clause. Nor has NVC shown that the procedures were futile or unavailable.

■ NVC's April 10, 1986 letter, Pl.Opp. Ex. E; *see* Comp. ¶ 31, did not satisfy the "written submission" requirement because there was no "dispute" between the parties at that time (rather, they agreed that Westar VI–S would be launched shortly after shuttle flights resumed, Comp. ¶ 31). (No dispute arose until Westar VI–S was taken off the manifest in October 1986.)

■ NVC's January 29, 1987 letter, Pl. Opp. Ex. H; *see* Comp. ¶ 57, also did not constitute a "written submission" of an unresolved dispute to the Associate Administrator for Space Flight but, instead, the parties' attempt to "dispose[ ] of [the dispute] by agreement." Indeed, the negotiations culminated in the March agreement, under which NVC received a refund and each party reserved its right to dispute other (unspecified) matters *in the future.* Comp. ¶ 58; Pl.Opp.

Exs. K, L. Reservation of a general right to file a future claim is not itself submission of a claim for purposes of invoking a right to a resolution under either the Contract Disputes Act or a contract dispute process. *Facilities Sys. Eng'g Corp. v. United States,* 25 Cl.Ct. 761, 763, 768 (1992) (court found no "claim," as Contract Disputes Act requires, despite plaintiff's reservation of its rights when accepting termination for the government's convenience).

■ Finally, even if NVC's March 24, 1994 letter, Comp. Ex. D, was not barred by laches or estoppel, *see Do–Well Machine Shop v. United States,* 870 F.2d 637, 640 (Fed.Cir. 1989) (when a disputes clause does not state a period within which claims must be asserted, the contractor "ha[s] an indefinite time period in which to present its … claims, subject of course to laches and estoppel principles"); *accord Farmers Grain Co. v. United States,* 29 Fed.Cl. 684, 687 (1993), it too did not satisfy the "written submission" requirement, because it did not specify either the "question of fact or law" still in dispute or the type or amount of damages sought. Nor was the May 24, 1994 letter, although it answered several of the questions NASA posed in its April 14 response, a "written submission" of a dispute under the disputes clause, for the same reasons (no identification of type of claim, or type or amount of damages sought).

■ Even if the March 24 or May 24 letter were to be deemed a "written submission," the August 3, 1994 letter, Comp. Ex. G, did not constitute a "written appeal" of any NASA decision on the dispute, since no decision was made by the NASA Associate Administrator for Space, as required by Article XVIII. (The amount of and basis for the claim not being specified, the Associate Administrator for Space obviously had insufficient information to understand the claim and therefore could make no decision, favorable or not.) Also, the purported "appeal" was addressed only to the NASA Administrator, rather than, as the disputes clause required, to the Administrator *and* the appropriate NVC official. The letter also did not state the legal basis for a claim or an

appeal, nor identify any "question of fact or of law arising under this Agreement," nor indicate the amount of recovery demanded. Finally, the letter did not even purport to seek a final "joint decision." Rather, it indicated that, absent unilateral *favorable* action by NASA, upon the strict terms established unilaterally by NVC, NVC would presume unfavorable action and select its *own* scenario for resolution of the dispute.

In short, NVC apparently concluded that it was entitled, even without a proper claim or joint final decision thereon, to deem the contract remedies exhausted and to seek judicial review of the presumed unfavorable action:

> Unless you notify New Valley by August 12, 1994 that you or your representative wish to meet to discuss a resolution of this dispute or agree that NASA is liable to New Valley for the damages sustained, we will assume that you are not interested in resolving this dispute pursuant to Article XVIII. In that event, the dispute procedure under the LSA will be exhausted.

Comp. Ex. G. Thus, the letter in effect notified NASA that a joint final decision was *not* being demanded, as it clearly assumed that a proper dispute existed and that such a decision was *not* contractually required (NVC having made it clear that, if a decision were not issued, for whatever reason, in the exact (albeit unspecified) form desired by plaintiff, it would be disregarded). An ultimatum that the Administrator within nine days accede to an unspecified claim for unidentified damages complies with neither the letter nor the spirit of the administrative disputes provision calling for a written submission of a dispute, followed by a decision, then an appeal and, finally, by a joint decision on the merits. *Cf. United States v. Carlo Bianchi & Co.,* 373 U.S. 709, 717, 83 S.Ct. 1409, 1414–15, 10 L.Ed.2d 652 (1963) (purpose of administrative disputes clause is so that evidence may not be withheld at the administrative level and not introduced until judicial proceedings).

### Termination

 Plaintiff contends that the LSA was not terminated for a contractually permissible reason, *i.e.,* for a "Reason[ ] Beyond

NASA's Control," specifically, an "act[ ] of the United States Government other than NASA," since the President "acted as NASA's leader" in issuing the 1986 policy.

First, as a matter of historical fact, it is clear that the new space policy was not an act by or of NASA, alone or principally, but, rather, an act of various other agencies involved in the formulation and implementation of space policy, such as the agencies represented on the Space Working Group—*e.g.,* the Departments of State, Commerce, and Transportation—as well as the CIA, the Agency for International Development, and the defense agencies, as well as the President.

Second, defining the President solely as the supervisor of NASA, when he supervises all executive branch agencies, not only is at variance with reality, but impermissibly constricts the meaning of the contractual phrase. If an act by an executive branch agency must be deemed an act of the President in his role as NASA's leader, no agency action may be considered an act of the "United States Government *other than* NASA" under the Agreement. Thus, if the phrase is to have any meaning, it must be read as being limited to actions of Congress. This reading is nonsensical, however, because the Agreement, if it had intended to refer only to acts of Congress could have used a single word, "Congress," instead of the phrase "the United States Government other than NASA." *See Hughes,* 998 F.2d at 958 (contract should be construed so that no part is superfluous).

The only logical purpose for this phrasing is to distinguish between actions of NASA alone and actions of other executive agencies. *See United States v. National Treas. Employees Union,* —— U.S. ——, ——, 115 S.Ct. 1003, 1010, 130 L.Ed.2d 964 (1995) (NASA is an executive agency). Generally, "government" means all three branches: the executive branch, Congress, and, the judiciary. *See Black's Law Dictionary* 695 (6th ed. 1990) ("In the United States, government consists of the executive, legislative, and judicial branches in addition to administrative agencies."); *see also McDonnell Douglas Corp. v. Islamic Republic of Iran,* 758 F.2d 341, 347–48 (8th Cir.1985) ("acts of the Unit-

ed States government" excusing performance of arms sale contract include Air Force order not to send military parts to Iran). In short, the intent of the LSA seems to have been to make the action of any agency, executive or congressional, a "Reason Beyond NASA's Control."

The 1986 revision to the space policy was performed by the President in his capacity as head of the executive branch, not merely as the supervisor of the NASA Administrator. This may be seen from the fact that the new policy is not identified as NASA's alone, and that it was recommended by the State Department, the CIA, the AID, and other Space Working Group agencies. Neither NASA, nor its Administrator alone (nor any member or agency of the executive branch), can direct the President's actions in his capacity as head of the executive branch and the agencies within that branch. Thus, it is only fitting that an agreement such as the LSA, entered into solely by NASA, would provide that NASA will not be responsible for acts by persons or agencies it does not control. The form of the 1986 order—an instruction by the President addressed to an executive agency—also underscores that it is a *presidential* action, not the action of a single agency such as NASA, *Franklin v. Massachusetts,* 505 U.S. 788, 797–803, 112 S.Ct. 2767, 2774–76, 120 L.Ed.2d 636 (1992), and thus constitutes an act by the United States government other than NASA alone.

For these reasons, the court concludes that the presidential order adopting the recommendation of the Space Working Group and directing NASA to cease launching commercial payloads was in fact, and also as a matter of law, a "Reason[ ] Beyond NASA's Control," which, under the terms of the LSA, allowed NASA to terminate the LSA without incurring damages for breach.

### Waiver of Judicial Claims

■ That the parties intended to waive *all* judicial claims is clear from the express language of the disputes clause, set out previously, which provides that the administrative resolution of any dispute by NASA authorized therein, whether or not involving a contractual claim, shall be "final and conclu-

sive." Appeals to this (or any other) court are not excepted.

Because the court concludes that no final decision has been issued as provided in the disputes clause here, it need not reach the question of the proper standard for reviewing such decision. Rather, the claim for judicial review must be dismissed, for failure to exhaust the administrative process established by the contract. *See Lynch v. United States,* 292 U.S. 571, 582, 54 S.Ct. 840, 844–45, 78 L.Ed. 1434 (1934) ("[I]mmunity from suit is an attribute of sovereignty which may not be bartered away. . . . When the United States creates rights in individuals against itself, it is under no obligation to provide a remedy through the courts. It may limit the individual to administrative remedies.") (citing *Tutun v. United States,* 270 U.S. 568, 576, 46 S.Ct. 425, 426, 70 L.Ed. 738 (1926); *United States v. Babcock,* 250 U.S. 328, 331, 39 S.Ct. 464, 465, 63 L.Ed. 1011 (1919)).

### Limitation of Damages

■ Contract provisions barring or limiting damage claims against the United States Government have been regularly enforced. *E.g., Wells Bros. Co. v. United States,* 254 U.S. 83, 85–86, 41 S.Ct. 34, 34–35, 65 L.Ed. 148 (1920). They are not considered unconscionable, particularly when the contractor is sophisticated and experienced: "[T]he presumption is obvious and strong that the men signing such a contract . . . protected themselves against such delays as are complained of by the higher price exacted for the work." *Id.* at 87, 41 S.Ct. at 35.

■ Plaintiff argues that, for numerous reasons, the term "non-performance" in Article V, paragraph 4 (waiving claims "for Damage or other relief . . . for non-performances or improper performance of Launch and Associated Services") must be construed, narrowly, to cover only NASA's inability to perform a particular launch, and not to permit "willful permanent non-performance of the entire LSA." The court considers this construction to be unsupported by the plain and unambiguous language of Article V of the LSA or the allocation of risk features of the LSA: "the parties, by absorbing the conse-

quences of damage to their property and employees without recourse against each other or other customers ... jointly contribute to the common goal of meaningful exploration of outer space." Comp. Ex. A at V–9.

Damages were foreseen, both under the contract and in the shuttle community generally, to be payable only by an insurance policy taken out and paid for by the commercial user. *See* Sheila Footer, *Legal Issues and Answers for Commercial Users of the Space Shuttle,* 13 Transp.L.J. 87, 96 (1983) ("NASA has expressly provided in the Launch Agreement that no action may be brought against it ... for damages or for other relief for any delay in launch services.... There is no protection for the user ... for costs resulting from delay, nonperformance, or mal-performance, and it is clear that these costs may be considerable.... In order for commercial users to secure full protection of their contract rights, it appears that they will have to make arrangements for private insurance coverage...."); *accord* S. Neil Hosenball, *The Space Shuttle in Perspective: Commercial Aspects, in The Space Shuttle & the Law* 117, 121–22 (Stephen Gorove, ed. 1980).

▮ Plaintiff contends that the argument that Article V of the LSA bars claims for indirect damages was made in the appellate briefs in *Hughes* and *American Satellite Co. v. United States,* 998 F.2d 950 (Fed.Cir. 1993), that the Federal Circuit implicitly rejected that position, and that this court therefore may not consider defendant's argument that Article V bars this claim. Those opinions, however, reversed the trial court's grants of summary judgment in favor of the defendant on other grounds (overruling the trial court's holding that the decision not to proceed with commercial launches was justified as a sovereign act, *see American Satellite Co. v. United States,* 26 Cl.Ct. 146 (1992); *Hughes Communications Galaxy, Inc. v. United States,* 26 Cl.Ct. 123 (1992)). The

Federal Circuit in those cases did not discuss Article V (the limitation of claims and damages provision) or Article VII (the termination clause), other than to provide background, in either case. (In fact, the court expressly declined to address *any* of the government's other defenses. *See Hughes,* 998 F.2d at 959 ("Our conclusion ... require[s] NASA, *absent the successful assertion of another defense in this case,* to bear the cost of changes in launch priority and scheduling resulting from the revised policy.") (emphasis added); *American Satellite Co.,* 998 F.2d at 953 n. 4 ("Because we vacate the summary judgment [on sovereign immunity grounds], *we do not address the parties' additional arguments.*") (emphasis added).)

The question of the applicability of the termination clause defense (Article VII), as a matter of law *or* fact, was expressly left open. *See Hughes,* 998 F.2d at 957 ("The [Claims C]ourt declined to determine whether or not the combined effect of the government's actions operated to invoke the contract's termination clause.") (citing *Hughes Communications Galaxy, Inc.,* 26 Cl.Ct. at 136; *American Satellite Co.,* 998 F.2d at 951–52 (noting that government agreed not to terminate and, unlike in this case, continued to hold open the possibility of launch up until suit filed in Claims Court)). Just as the opinions did not discuss Article VII, they also did not discuss the basis for termination therein—"Reasons Beyond NASA's Control," as defined in Article XX.

Because a decision leaving a question open does not establish precedent on that issue, *Gately v. Massachusetts,* 2 F.3d 1221, 1226 (1st Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 1832, 128 L.Ed.2d 461 (1994); *American Cyanamid Co. v. New Penn Motor Express, Inc.,* 979 F.2d 310, 316 n. 10 (3rd Cir.1992), neither defendant nor this court is precluded from relying on Article V.[8]

---

8. On remand, the trial court in *Hughes* and *American Satellite Co.* concluded that defenses based on the termination and waiver clauses of the LSA were barred under the law of the case doctrine, because they had been implicitly rejected by the Federal Circuit. *American Satellite Co. v. United States,* 34 Fed.Cl. 468, 477–78, 480

(Fed.Cl.1995); *Hughes Communications Galaxy, Inc. v. United States,* 34 Fed.Cl. 623, 633–34 (1995). While an implicit rejection may form the law of the case, it does not create precedent binding in other cases, so those defenses are available here even if they are barred in *Hughes* and *American Satellite Co.*

■ Plaintiff also argues that any determination that the President's 1986 policy excused NASA's non-performance is precluded by the Federal Circuit holdings in these cases that Article IV of the LSAs, which incorporated by reference a 1982 presidential launch policy, controlled over Article XV, which provided that services would be provided in accordance with (evolving) United States law and published policies. *Hughes,* 998 F.2d at 957–58; *American Satellite Co.,* 998 F.2d at 952–53. The Federal Circuit did not hold, however, that termination, pursuant to *Article VII,* for governmental acts other than those by NASA, must be governed by Article IV and cannot constitute a defense to Hughes's claim. Such a reading would make the Article VII standard for termination superfluous, since it could not be invoked in any situation when it obviously was intended to apply—when a government act not by NASA *prevents* NASA's "best efforts" performance pursuant to the 1982 space policy. At most, the court held that the 1986 policy could not constitute a defense grounded in sovereign immunity or Article XV of the LSA. Again, the issue has been left open and defendant is not precluded from raising it.

### Taking Claim

■ Plaintiff argues that, even if it waived its claims for breach of the LSA in paragraph 4 of Article V, it did not waive its takings claim. However, in Article V, paragraph 4, plaintiff waived its claims for contract damage *"or other relief,"* presumably including takings claims, for the non-performance of the agreement. Also, breach of contract, being foreseen, could not interfere with NVC's investment-based reasonable expectations. *Connolly v. Pension Benefit*

*Guar. Corp.,* 475 U.S. 211, 225, 106 S.Ct. 1018, 1026, 89 L.Ed.2d 166 (1986).

Also, this argument is untenable under a long line of precedent binding on this court, *see, e.g., Sun Oil Co. v. United States,* 572 F.2d 786, 818, 215 Ct.Cl. 716 (1978), holding that breach of contract does not support a takings claim, *cf. Mid–Am. Waste Sys. v. City of Gary, Ind.,* 49 F.3d 286, 289 (7th Cir.1995) (treating breach of contract as a taking "has the potential to move ordinary contract litigation ... into federal court despite the lack of diversity jurisdiction, by making every breach of contract a federal issue")[9]; *Sangre de Cristo Dev't Co. v. United States,* 932 F.2d 891, 894 (10th Cir.1991) (breach of contract not taking because did not deprive appellant of "vested property interest"), *cert. denied,* 503 U.S. 1004, 112 S.Ct. 1760, 118 L.Ed.2d 423 (1992); *see American Satellite Co.,* 26 Cl.Ct. at 158, *rev'd on other grounds,* 998 F.2d 950 (Fed.Cir. 1993)[10]; *Hughes Communications Galaxy, Inc.,* 26 Cl.Ct. at 145–46, *rev'd on other grounds,* 998 F.2d 953 (Fed.Cir.1993).[11]

### Conclusion

For the reasons stated above, defendant's motion to dismiss is granted. The Clerk is ordered to dismiss the complaint.

■

---

**9.** The Seventh Circuit in *Mid–American Waste Systems* also noted that courts "have resisted the implication that every government-contract case belongs in federal court," and that "[a]t least three circuits have held that only contracts creating a special status (employment, for example) count as 'property.'" 49 F.3d at 289. The court suggests that claims of breach of contract pleaded as a taking are essentially substantive due process claims. *Id.* at 291–92.

**10.** American Satellite did not appeal the dismissal of its takings claim. *See* Brief for Appellant, *American Satellite Co.,* 998 F.2d 950 (Fed.Cir. 1993) (No. 92–5136).

**11.** The Federal Circuit did not address Hughes's appeal of the dismissal of its takings claim, *see* Brief for Appellant at 47–50, *Hughes Communications Galaxy, Inc.,* 998 F.2d 953 (Fed.Cir.1993) (No. 92–5137).