**NEW VALLEY CORP., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 94–785C.

United States Court of Federal Claims.

Aug. 19, 2005.

Sarah S. Gold, Proskauer Rose LLP, New York City, attorney of record for plaintiff. Elise A. Yablonski, of counsel.

Doris S. Finnerman, with whom were Assistant Attorney General Peter D. Keisler and Director David M. Cohen, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, for defendant. Scott Barber, Office of the General Counsel, NASA, of counsel.

## OPINION

WIESE, Judge.

In this action, plaintiff, New Valley Corporation, seeks to recover damages allegedly resulting from the National Aeronautics and Space Administration's ("NASA") breach of a "best efforts" contract to launch into earth orbit plaintiff's Westar VI–S communications satellite. The case is currently before the court following a trial held from July 26–29 and August 2, 2004, to determine whether, absent the breach, plaintiff would have been ready, willing, and able to proceed with performance under the contract on the January 19, 1990, stipulated launch date.[1] For the reasons set forth below, we conclude that

---

1. This case was transferred to the undersigned judge on December 15, 2004. Following the transfer, the court offered the parties the opportunity to retry the case. Each side declined, however, and instead asked the court to decide the case on the basis of the existing trial record.

Upon completion of post-trial briefing, the parties similarly declined the opportunity for oral argument. Accordingly, based on the comprehensive nature of the post-trial briefs, we now decide this case without oral argument.

defendant is liable for breach of contract but defer a determination of damages until after the presentation of additional evidence.

## FACTS

### A.

On January 10, 1984, the Western Union Telegraph Company ("Western Union"), the principal subsidiary of the Western Union Corporation (now called New Valley Corporation), formalized a launch services agreement with NASA which committed that agency to use its best efforts through September 1995 to launch two of Western Union's communications satellites. Pursuant to this agreement, NASA launched the first of the two satellites on February 3, 1984. The launch date for the second satellite, the Westar VI–S, although postponed several times, was eventually scheduled for June 24, 1986.

On January 28 of that year, however, the Space Shuttle Challenger exploded during launch. In response to this tragic event and the investigation that followed, NASA advised Western Union in a February 19, 1986, letter that it had decided "to suspend planning for a June 24, 1986 launch." The Challenger investigation led to a reevaluation of the nation's space program and eventually to a decision, announced by President Reagan on September 25, 1986, to restrict NASA's launch services to those satellites with payloads that either were shuttle-unique or had national security and foreign policy implications.

Consistent with this decision, NASA released a post-Challenger shuttle manifest on October 3, 1986, which omitted all non-qualifying commercial payloads, including the Westar VI–S. In a follow-up letter to Western Union dated October 30, 1986, NASA explained the Westar VI–S's exclusion from the launch schedule by noting that "within the priorities from which we have developed this [October 3, 1986] manifest, it has not been possible to set a launch date for your payload." The agency went on to say that "[i]t appears almost certain that you will not be provided launch services either prior to or after your current contract expires in September 1995." NASA advised that because

of this "delay," Western Union was contractually entitled to terminate its launch services agreement and receive a refund of its progress payments. Western Union did not, however, terminate the agreement.

Immediately following NASA's decision to suspend the Westar VI–S's June 1986 launch, Western Union began to investigate alternative launch options. Specifically, Western Union entered into discussions with the McDonnell Douglas Corporation (the American-based manufacturer of the Delta launch vehicle), Arianespace SA (the French manufacturer of the Ariane launch vehicle), and the China Great Wall Industry Corporation (the Chinese manufacturer of the Long March launch vehicle).

None of these efforts, however, proved successful. Discussions with McDonnell Douglas stalled at the preliminary stage because Western Union found the cost of a Delta launch too expensive. Similarly, negotiations with Arianespace came to a halt, despite Western Union's payment of a $100,000 non-refundable launch reservation deposit, when Arianespace experienced a launch failure on May 30, 1986, and thereafter canceled all launches pending an investigation of the cause of the failure. Finally, Western Union's dealings with China Great Wall, although actively pursued for approximately two years, were terminated in early 1988 upon Western Union's proposed sale of its Westar Division assets (including the Westar VI–S satellite) to Hughes Communications, Inc., a sale that was ultimately completed on January 20, 1989.

### B.

During the five-year period (1984–89) in which Western Union was actively pursuing the launch of the Westar VI–S, it was, at the same time, a company beset with substantial financial concerns. Indeed, as we explain more fully below, the sale of the Westar Division assets was one of a number of actions taken by Western Union to address these concerns.

Western Union's financial difficulties, first manifested in 1983, related back to a $1 billion capital expenditure program involving the construction of new transmission facilities

and other plant and equipment improvements which the company initiated in 1982 and funded through the issuance of long-term debt and preferred shares. At the time it assumed these financial obligations, Western Union anticipated that revenues from its message and data networks, Telex and EasyLink, would support the required interest and dividend payments. That expectation was never fully realized, however, because of start-up delays in the EasyLink system and lower-than-expected revenues from the Telex network. As a result, Western Union was experiencing a severe cash shortage by the end of 1984—a shortage brought on by large fixed costs and a declining revenue base. For the year ending December 31, 1984, Western Union reported a net loss of $58.4 million.

In order to raise needed cash, Western Union began to sell off some of its assets. In 1985, the company sold two of its subsidiaries and also sold its accounts receivable to its lending banks. Similarly, in early 1986, Western Union sold its government services division and used a portion of those proceeds to reduce its outstanding debt. Although these actions helped avert any immediate concerns about a corporate bankruptcy, they provided only a temporary solution to Western Union's ongoing liquidity problems. For the year ending December 31, 1985, Western Union's losses had widened to $367.2 million and its total indebtedness stood at $959 million.

In late 1987, Western Union's worsening financial condition forced it to undertake a major restructuring of the company and to transfer a controlling equity interest in Western Union to a private investor, Bennett S. LeBow. In a September 18, 1987, letter to its shareholders, Western Union explained the necessity for the proposed restructuring:

> In its current precarious financial condition ... Western Union does not have the resources to support its existing debt service requirements over any extended period of time.... Western Union has been able to avoid filing for bankruptcy over the past several months primarily because of its receipt of asset sale proceeds. Any funds from projected asset sales would only post-pone the moment at which cash resources would become insufficient.... Western Union believes that in order to survive and return to profitability it must both drastically revise its business operations and restructure its debt.

The plan of reorganization, which won shareholder approval in December 1987, involved the retirement of Western Union's existing bank debt, the exchange of its outstanding publicly held debt for new senior and preferred shares, the issuance of $500 million of new senior secured debentures and, finally, the acquisition of ITT World Communications, Inc. ("WorldCom"), an independent corporation involved in international communications services. After the payment of all existing debt and the purchase of WorldCom, Western Union emerged from the restructuring with $120 million in working capital.

The acquisition of WorldCom and its consolidation with Western Union was part of a corporate strategy to refocus the business of Western Union from what was described in a 1988 shareholder report as "its unprofitable position as a facilities-based operator of domestic telecommunications transmission services" to "a new role as a leading international provider of electronic messaging, financial and other value-added services in the business and consumer markets." The same shareholder report went on to describe the progress in achieving these goals as "significant," noting in this connection the divestiture of "major parts of the Company's facilities-based operations, including the Westar satellite communications system (in January 1989)."

Although Western Union and WorldCom, operating as a consolidated enterprise, were expected to emerge as a leading provider of international telecommunications services, the anticipated turnaround in Western Union's business fortunes failed to materialize. The advent of the facsimile—a more advanced form of electronic communications that rapidly gained business acceptance—displaced Telex as the preferred means of message transmission. As a consequence, Western Union attained neither the market position nor the revenue flow that it had

hoped to establish in that business sector. As Mr. LeBow explained at trial: "[O]ur basic intent was [that] the two telex businesses would generate large cash flow, and unfortunately the facsimile came in faster than telex, and telex died quicker than we thought."

Less than two years after the restructuring of its finances and business operations, Western Union was thus once again confronting a liquidity crisis arising from its declining revenues and burdensome corporate indebtedness (then approaching $1 billion, $500,000 of which carried interest obligations as high as 19¼ percent). Together, these factors led Western Union to report a loss from operations of $1.1 billion in 1988 and $32.3 million in 1989. In its Form 10–K filed with the Securities and Exchange Commission ("SEC") for the year ending December 31, 1989, Western Union recognized the gravity of the situation it faced, acknowledging that "[c]urrent cash levels and anticipated cash flows for 1990 will not be sufficient to permit Western Union to both fund its operations and meet its debt service obligations for the entire year." The report went on to say that absent a restructuring of the terms of its existing debt or the generation of cash in sufficient amounts either through the sale of assets or the issuance of new debt or equity securities, "Western Union would be unable to make the June 15, 1990 interest payments on the 19¼% Notes and the 16% Notes due June 15, 1991 ... aggregating $51 million." The report further acknowledged that absent a resolution of its cash problem, Western Union faced default on its obligations, a situation that would compel Western Union to seek protection under the Bankruptcy Code.

The following year brought little improvement to Western Union's financial condition. Although the company did succeed in liquidating roughly one-third of its outstanding long-term debt, that reduction in debt did not relieve its pressing need for cash. Thus, in its Form 10–K filed with the SEC for the year ending December 31, 1990, Western Union advised that "[c]ompletion of [its debt reduction] did not resolve the Corporation's liquidity crisis and the Corporation will have substantial external financing needs in 1991 and 1992.... The Corporation does not currently have the cash resources to meet all of its debt obligations due in 1991 and believes that it may exhaust its existing cash resources in the second quarter of 1991." The report went on to say that the company was pursuing various avenues to raise funds and obtain new financing but cautioned that should these efforts fail, "the Corporation could determine to seek protection from creditors under Chapter 11 of the Bankruptcy Code or ... creditors could file an involuntary bankruptcy petition against the Corporation."

Western Union's search for new funds ultimately proved unsuccessful. As a consequence, the company filed a petition for protection in bankruptcy court in November 1991.

### C.

In October 1994, Western Union, operating under its new name, New Valley Corporation, filed suit in this court claiming a breach of contract and, in the alternative, a taking of its property without the payment of just compensation. The complaint sought the recovery of damages "believed to be in excess of $30,000,000." [2]

Although the trial court dismissed the complaint on several grounds, none of its conclusions survived appeal. *New Valley Corp. v. United States*, 34 Fed.Cl. 703 (1996), *rev'd*, 119 F.3d 1576 (Fed.Cir.1997).[3] In re-

---

2. In early 1987, NASA returned $4,783,264 to Western Union, an amount representing the earnest money and progress payments the company had paid pursuant to its launch services agreement. The parties agreed, however, that the payment of this sum would not prejudice plaintiff's right to pursue a claim for damages under the contract.

3. The trial court granted defendant's motion to dismiss on three grounds: (i) plaintiff had failed to exhaust its administrative remedies; (ii) the contract permitted termination of performance when based on reasons beyond NASA's control; and (iii) the contract contained language prohibiting a claim against the United States for nonperformance. 34 Fed.Cl. at 709. The appeals court rejected each of these conclusions, ruling that (i) plaintiff had indeed exhausted its administrative remedies, (ii) NASA had failed to invoke the termination clause (because it never formally

versing the trial court's decision, the appellate court reaffirmed its earlier holding in *Hughes Communications Galaxy, Inc. v. United States*, 998 F.2d 953 (Fed.Cir.1993), a case precipitated by the same set of facts as the instant case:

> We held in *Hughes* ... that this new policy [NASA's October 1986 restricting of launches to those that either were shuttle-unique or had national security and foreign policy implications] conflicted with [the launch services agreement's] launch priority and scheduling policy and that the government was required under the [agreement] to bear the costs for this change, absent the successful assertion of another defense.

*New Valley*, 119 F.3d at 1578. By abandoning its commitment to use its best efforts to accomplish the launch of the Westar VI–S, in other words, NASA had repudiated the contract and in so doing, had occasioned a right to damages absent, in the words of the appellate court, "the successful assertion of another defense." *Id.*

Following issuance of the Federal Circuit's order of remand, litigation resumed before this court with the filing of cross-motions for summary judgment. In its motion, plaintiff argued that it was entitled to judgment as a matter of law as to both liability and damages, a conclusion it based on (i) the Federal Circuit's ruling that NASA had breached the contract, (ii) the fact that Western Union was ready, willing, and able to perform the contract on the date the breach occurred (October 3, 1986), and (iii) the absence of any evidence disputing the amount of damages identified with what plaintiff referred to as the "replacement launch method," *i.e.*, the additional costs it would have incurred had it actually entered into a replacement launch services contract.

In its cross-motion, defendant argued that the critical date for testing Western Union's capacity to perform the contract was not the October 3, 1986, date the breach occurred, as plaintiff maintained, but rather was the date

the launch would have taken place had the contract remained in force, namely, January 19, 1990. In defendant's view, plaintiff would not have proceeded with the contract on that date even absent the breach because of the company's deteriorating financial condition and the limitations on funding of launch-related expenditures that that condition would have imposed. In short, defendant argued that plaintiff would not have been ready, willing, and able to perform the contract on the stipulated launch date, thus excusing defendant from any liability for a contract breach.

In the alternative, defendant maintained that plaintiff could not recover damages based on the cost of a substitute performance in the absence of an actual replacement transaction. Since plaintiff did not in fact reprocure the launch services that NASA had failed to provide, defendant argued that damages based on the difference between the contract price and the market price were purely hypothetical and therefore did not offer an acceptable basis for a damages award. In addition, defendant argued that the replacement damages plaintiff seeks are also precluded by the fact that plaintiff sold the satellite in question. Specifically, defendant maintained that the sale of the Westar VI–S should be viewed as a step in the mitigation of damages, an action that, according to defendant, conceptually forecloses a recognition of damages measured against a contract performance model.

Finally, defendant urged the court to dismiss plaintiff's takings claim on the ground that plaintiff did not possess a compensable property interest in either the shuttle launch or any associated equipment under the terms of the launch services agreement.

In a February 28, 2002, unpublished opinion, the court granted defendant's motion to dismiss plaintiff's takings claim but denied the parties' cross-motions for summary judgment on liability. *New Valley Corp. v. United States*, No. 94–785C, slip op. (Fed.Cl. Feb. 28, 2002). The court began its analysis by

---

terminated the contract), and (iii) the contract's exculpatory language precluding NASA's liability for nonperformance "was intended to immunize the government from a claim for non-perform-

ance only where it had complied with its contractual duty to use its best efforts." 119 F.3d at 1584.

noting that "defendant no longer disputes that NASA's October 30, 1986, letter, informing plaintiff that no more launch services would be provided, was an anticipatory repudiation of the [launch services agreement]." *Id.* at 4. The court then went on to make the following determinations of law with respect to the issue of liability:

- In order to recover damages for an anticipatory repudiation, an injured party, although not required to remain ready to perform in response to a breach, must nevertheless show that it would have been ready to do so when, if the contract had continued, its performance would have come due. *Id.* at 7.

- Even if the wrongful repudiation justifies the injured party's taking steps before performance is due that might make its subsequent performance impossible, the injured party is not relieved of the obligation to show that absent the repudiation, it would have been ready, willing, and able to perform when performance was due. *Id.*

- To establish that it was ready, willing, and able to perform the contract, plaintiff need not show that it would have been able to make payments of the approximately $4.5 million it still owed to third-party providers of launch-related services and equipment. *Id.* at 8 n. 4. Rather, plaintiff need only show that it was ready, willing, and able to pay NASA $4.7 million at least 30 days prior to launch. *Id.* at 9.

- Evidence showing that plaintiff was on the verge of bankruptcy both before and after the repudiation as well as its subsequent retreat into bankruptcy in November 1991 give rise to a reasonable inference that plaintiff would not have been able to make its final payments to the government 30 days prior to launch regardless of the repudiation. *Id.* at 9–10.

Turning to the issue of damages, the court made several additional determinations of law:

- Damages consist of the difference between the contract price and the market price for comparable launch services. Plaintiff has no obligation to "cover" (*i.e.*, obtain comparable services), however, in order to receive this measure of damages. *Id.* at 11.

- The proceeds received by plaintiff from the sale of the satellite to Hughes Communications may not be claimed as an offset to the damages owed by the government because to do so would give defendant a windfall from a transaction unrelated to the contract. The sale of the satellite, in other words, does not qualify as an undertaking in the mitigation of damages. *Id.* at 12.

In denying the parties' cross-motions for summary judgment on liability, the court concluded that "genuine issues of material fact exist with respect to whether plaintiff would have been able to perform the contract at the scheduled performance time absent the repudiation." *Id.* at 13–14. It is this issue to which the court now turns for decision after trial.[4]

### DISCUSSION

Since the remand of this case by the Federal Circuit, two issues have dominated the parties' debate. The first issue centers on defendant's contention that even if a breach had not occurred, financial constraints would have prevented plaintiff's performance of the contract; hence, plaintiff was not ready, willing, and able to perform the contract and thus, no damages are owed. The second issue involves plaintiff's claim that it was in fact ready, willing, and able to perform the contract and therefore is entitled to damages measured by the difference between the contract price and the market price for comparable launch services, even in the absence of a substitute transaction. Based on the facts developed at trial, we conclude that the analytical framework appropriate to this case requires us to look beyond these issues.

---

**4.** In its opinion, the court also rejected plaintiff's motion for summary judgment on damages because of "genuine issues of material fact regarding the cost of substitute launch services." *Id.* at

**14.** The evidentiary concerns presented by this issue, however, were resolved by a stipulation of facts agreed to by the parties prior to trial.

■ Defendant's focus on plaintiff's financial ability to perform the contract stems from the general rule of contract damages that "[r]ecovery can be had only for loss that would not have occurred but for the breach." Restatement (Second) of Contracts § 347 cmt. e (1981). The application of this rule in the context of an anticipatory repudiation is set forth in the Restatement as follows: "A party's duty to pay damages for total breach by repudiation is discharged if it appears after the breach that there would have been a total failure by the injured party to perform his return promise." Restatement (Second) of Contracts § 254(1) (1981). Defendant thus maintains that plaintiff's right to recover damages is predicated on its having been ready, willing, and able to perform the contract on the date performance would have been due and that absent proof of such capacity to perform, damages are unavailable.

■ Defendant's position, however, takes too narrow a view of the issue of entitlement to damages for a contract breach. As the court recognized in *Record Club of America, Inc. v. United Artists Records, Inc.*, 890 F.2d 1264, 1275 (2d Cir.1989), Section 254 of the Restatement is "merely an application of the general rule that the complaining party must demonstrate that the breach caused him injury." That section, in other words, recognizes that in an anticipatory repudiation, as in a case of breach by nonperformance, the breach must be shown to be the proximate cause of the alleged injury.

■ Proceeding from this perspective, then, we read the evidence to show that while Western Union would have sold the Westar Division assets even if a January 1990 launch date had been available, those assets would have been more valuable had they included NASA's commitment to a $10 million launch contract. That conclusion, which is based on the uncontradicted testimony of Jerald Farrell, the former president of Hughes Communications (the company that acquired the Westar Division assets), takes plaintiff's proof as far as it needs to go. Mr. Farrell's testimony makes clear that had the breach not occurred, plaintiff would have been able to realize at least some of the value inherent in its contract with NASA by including the contract as part of the sale of the Westar Division assets.[5] Given this fact, it becomes irrelevant whether or not plaintiff had the financial capacity to launch the satellite in its own right—under either scenario, the breach must be seen as the proximate cause of injury to plaintiff.

■ Turning to the second issue on which the parties have focused—whether, in the absence of an actual substitute transaction, plaintiff is entitled to damages based on the difference between the contract price and the market price for comparable launch services—we believe the relevance of this issue has been overtaken by the facts. In this case, it is the loss identified through a hypothetical sales transaction—the amount that would have been realized from the sale of the Westar Division assets in the absence of a breach—that establishes both the fact of injury and plaintiff's right to damages. Accordingly, it is that same hypothetical transaction to which we now must look to establish the measure of plaintiff's damages. The question we must address is how much more Hughes Communications would have paid for the Westar Division assets had they included a NASA launch contract.

Some guidance in this matter may be gleaned from the parties' stipulation which identifies the cost of comparable launch services as ranging from $20.9 million for a Chinese Long March launch to $31.6 million for a launch on a Delta, Ariane, or Atlas launch vehicle. This market data, however, cannot be taken as the exclusive determinant of plaintiff's loss. As an initial matter, differences in the bargaining strength of the par-

---

5. The court recognizes that plaintiff's contract with NASA contained a provision restricting assignment of the contract "except as otherwise expressly agreed to by NASA in writing or as may be required pursuant to law." We do not, however, view this provision as an impediment to a sale by plaintiff of its contract rights given the law's general endorsement of the assignability of contract rights, *see* Restatement (Second) of Contracts § 317 (1981), and the several specific instances, included among the exhibits in the current record, showing NASA's approval of assignments of launch rights.

285

ties—Western Union being a financially stressed organization—would suggest that the price Western Union would have to pay to obtain a substitute launch contract would not correspond to the price it could expect to receive from the sale of a launch contract. Additionally, there is the question of when, absent the breach, the parties would have been notified of the January 1990 launch date. Without the certainty of a known launch at the time of the sale of the Westar Division assets, market data regarding launch costs presumably would not be a major factor in determining the final selling price. Finally, there is a question as to the effect, if any, that a resumption of commercial satellite launches by NASA would have had on the prevailing market price for such launches. Supplementary trial proceedings will thus be required to address these issues and the numerous other questions that a hypothetical supplement to an actual sales transaction can be expected to raise.[6]

In defining plaintiff's right to damages by reference to such a sales transaction, we do not mean to suggest that plaintiff's financial condition would have played no part in that transaction. To the contrary, we believe the sale of the Westar Division assets in the no-breach world would have occurred for precisely the same reasons that it occurred in the real world—namely, the need to change corporate direction and to find relief from an ever-pressing debt burden. At the time it sold the Westar Division assets, Western Union was a company that stood on the precipice of bankruptcy—a condition to which it ultimately succumbed two years later. Any unrecovered costs that plaintiff experienced in its real-world sale of the Westar Division assets, therefore, also would have occurred in the no-breach world. Such losses reflect the exigencies of plaintiff's financial position, a situation that NASA's breach of contract neither caused nor contributed to. Such costs, therefore, are not assignable to defendant.

## CONCLUSION

For the reasons set forth above, the court concludes that plaintiff is entitled to damages on account of NASA's breach of contract in an amount to be determined through evidence presented in a supplementary trial proceeding. The court will contact the parties at a later date to schedule a hearing to discuss the details of such a proceeding.

---

6. In calculating damages based on the unrealized sale value of the launch contract, we do not reach the issue of whether the $11 million loss on the Westar VI–S (representing the difference between its purchase price by Western Union and the resale price to Hughes) is properly an element of reliance damages. It is worthy of note, however, that with the exception of this disputed amount, defendant concedes $4,683,850 in damages under a reliance theory.