MAYER, Circuit Judge.
New Valley Corporation appeals the order of the United States Court of Federal Claims, 34 Fed.Cl. 703 (1996), dismissing its complaint seeking damages for breach of contract or just compensation for a taking allegedly caused by the National Aeronautics and Space Administration’s (NASA) failure to launch New Valley’s satellite. Because New Valley did not fail to exhaust its administrative remedies, did not waive its rights to bring this claim, and because the government did not terminate their contract, we reverse and remand.

Background

This case, like Hughes Communications Galaxy, Inc. v. United States, 998 F.2d 958 (Fed.Cir.1993), and American Satellite Co. v. United States, 998 F.2d 950 (Fed.Cir.1993) (ASC), arises out of the space shuttle Challenger’s tragic explosion on January 28,1986. Prior to that time, in January 1984, New Valley Corporation (then known as Western Union Telegraph Company) entered into a Launch Services Agreement (“LSA” or “contract”) with the United States, represented by NASA. Under the LSA, NASA agreed to use its “best efforts” to launch two New Valley telecommunications satellites, the Westar VI and Westar VII (later renamed Westar VI-S), from the space shuttle. The *1578 LSA was to be effective until September 1995 or until both satellites were launched, whichever came first. NASA successfully launched Westar VI and ultimately assigned Westar VI-S a “Firm Launch Date” of June 24,1986.
The LSA granted the government the right to terminate the LSA for four specific reasons, only one of which is relevant here. Under Article VII,[1] NASA could terminate the LSA “upon a determination in writing that NASA is required to [terminate such services for Reasons Beyond NASA’s Control.” Article XX defined “Reasons Beyond NASA’s Control” to include “acts of the United States Government other than NASA, in either its sovereign or contractual capacity.”
Article V of the LSA allocated the risks of liability “arising out of’ the launch services to be provided by the government. Paragraph 4 of that article addressed “Customer Claims Against the United States Government and Its Contractors,” and provided, in part:
Without affecting the right of the Customer to pursue the procedure under the Disputes provision set forth in Article XVIII of this Agreement, the Customer shall not make any claim against the United States Government or the United States Government’s contractors and subcontractors ... for the non-performance or improper performance of Launch and Associated Services, including, but not limited to, the performance by the United States Government or the United States Government’s contractors and subcontractors of research, design, development, test, manufacture, assembly, integration, transportation or use of any materials related to STS [Space Transportation System] Operations or in the performance of other services related to STS Operations____
The LSA’s Disputes clause, referenced in paragraph 4 of Article V, provided, in part:
Any dispute, whether or not involving an alleged breach of this Agreement, concerning a question of fact or of law arising under this Agreement, which is not disposed of by agreement, shall be reviewed by the NASA Associate Administrator for Space Flight, who shall attempt to resolve the dispute. If the attempt of the NASA Associate Administrator for Space Flight is not successful within sixty days after written submission to him, either party may mail or otherwise furnish a written appeal addressed to the NASA Administrator and the President, or other appropriate official, of the Customer. The joint decision of the NASA Administrator and the President, or other appropriate official, of the Customer, or their duly authorized representatives for the determination of such appeal, shall be final and conclusive ____
On January 28, 1986, four days after Westar VI-S was assigned its June 24, 1986, “Firm Launch Date,” the space shuttle Challenger exploded just after takeoff. President Reagan formed a commission to investigate the tragedy. It concluded that NASA’s responsibility to launch commercial payloads like New Valley’s was at least partly responsible for the decision to launch the Challenger. On August 15, 1986, the President announced that “NASA will no longer be in the business of launching private satellites.” 22 Weekly Comp. Pres. Doc. 1103, 1104 (Aug. 15, 1986). At that time, forty-four commercial payloads containing satellites, including Westar VI-S, were scheduled for launch. As for these payloads, the President decided ultimately to put only the payloads requiring launch from a manned vehicle or having national security or foreign policy implications on the launch manifest. We held in Hughes and ASC that this new policy conflicted with Article IV’s launch priority and scheduling policy and that the government was required under the LSA to bear the costs for this change, absent the successful assertion of another defense. See Hughes, 998 F.2d at 958-59 & n. 8.
On October 3, 1986, NASA announced the new launch manifest, which did not include Westar VI-S. By letter dated October 30, 1986, NASA formally notified New Valley that it had not been possible to set a launch date for Westar VI-S and that it
*1579 appealed] almost certain [New Valley] w[ould] not be provided launch services either prior to or after [its] ... contract expire[d] in September 1995. At the very least, it can be said with absolute certainty that [New Valley’s] payload will be delayed far in excess of the nine-month period described in ... your [LSA]. Thus, should you wish to terminate your LSA prior to its expiration, Article VII provides you may do so based on this delay.
On January 21, 1987, New Valley representatives met with NASA representatives to discuss New Valley’s claim for losses caused by NASA’s failure to launch Westar VI-S. New Valley then sent a letter to NASA’s “General Manager” seeking $58,596,964. This amount included $4,783,264 paid to NASA for launch services and reservation fees for future launches; $12,063,700 that it spent preparing Westar VI-S for launch; $29,750,000 spent for increased launch expenses (including modifications to the satellite and increased insurance costs); and $12,-000,000 for “Loss of Capital Investment.” In March 1987, NASA agreed to refund $4,783,-264 in progress payments and earnest money. Each party expressly reserved “any and all claims or rights it may have with respect to damages arising from the LSA.” In May 1988, New Valley sold Westar VI-S to Hughes Communications Galaxy, Inc., and it was launched commercially in October 1990.
On March 24, 1994, New Valley wrote NASA’s Associate Administrator for Space Flight, requesting “review and resolution of the dispute between NASA and New Valley arising out of NASA’s failure and refusal to launch New Valley’s” satellite. New Valley claimed that this failure amounted to a breach of the LSA and a taking. Although New Valley recognized that NASA had rejected its claim in 1987, it requested reconsideration of that claim based on our Hughes and ASC eases, which issued on July 7, 1993. New Valley requested that NASA respond as soon as possible and no later than 60 days. NASA stated that if New Valley established that it possessed rights under the LSA (as opposed to Western Union Telegraph Company, whose name was on the contract), it would review the claim “within the context of the LSA disputes clause.” Western Union responded on May 24, 1994, that its name had been changed to New Valley, so any and all rights under the LSA resided with New Valley.
Having heard nothing from NASA, New Valley wrote to NASA Administrator Daniel Goldin on August 3,1994, informing him that NASA’s Associate Administrator for Space Flight had not resolved the dispute over the government’s purported breach within sixty days of submission, as prescribed by the LSA. Accordingly, New Valley requested Administrator Goldin’s decision and stated that unless he notified New Valley by August 12, 1994, that he would meet to discuss the dispute or admit NASA’s liability, it would consider Article XVIII’s disputes process exhausted. New Valley received no response.
On October 28, 1994, New Valley filed suit in the Court of Federal Claims[2] asserting a breach of contract and the taking of property without just compensation. The court granted the United States’ motion to dismiss the complaint for failure to state a claim upon which relief may be granted, holding that New Valley had failed to exhaust the administrative disputes process of the LSA and had contractually waived any claim for breach of contract. The court also held that President Reagan’s decision to cease launching commercial payloads was a reason beyond NASA’s control, which entitled NASA to terminate the LSA without incurring breach of contract damages. New Valley appeals.

Discussion

The grant of a motion to dismiss for failure to state a claim upon which relief may be granted is appropriate where the plaintiff cannot assert a set of facts that supports its claim. Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-02, 2 L.Ed.2d 80 (1957); Highland Falls-Fort Montgomery Cent. School Dist. v. United States, 48 F.3d 1166, *1580 1169 (Fed.Cir.1995). Whether the court properly granted the government’s motion is a question of law, over which we exercise plenary review. Highland Falls-Fort, 48 F.3d at 1166-67; Mitchell Arms, Inc. v. United States, 7 F.3d 212, 215 (Fed.Cir.1993). We assume that all well-pled factual assertions are true and make all reasonable inferences in favor of New Valley. Berkovitz v. United States, 486 U.S. 531, 540, 108 S.Ct. 1954, I960, 100 L.Ed.2d 531 (1988); Highland Falls-Fort, 48 F.3d at 1166-67.
New Valley argues that the court made three primary errors: (1) holding that New Valley failed to exhaust its administrative remedies, (2) concluding that NASA was permitted to terminate the LSA, and (3) holding that New Valley waived all judicial claims. These are all issues of contract interpretation, which begins with the plain language. United Int’l Investigative Servs. v. United States, 109 F.3d 734, 737 (Fed.Cir. 1997). We must interpret the LSA as a whole and in a manner that gives meaning to all of its provisions and makes sense. McAbee Constr. Inc. v. United States, 97 F.3d 1431, 1435 (Fed.Cir.1996). An interpretation that gives a reasonable meaning to all of its parts is preferred to one which leaves a portion of the LSA inoperative, void, meaningless, or superfluous. Julius Goldman’s Egg City v. United States, 697 F.2d 1051, 1058 (Fed.Cir.1983). Applying these well-settled canons of contract construction, we agree that the court erred in interpreting the LSA and in dismissing New Valley’s complaint. We address each issue in turn.
A Exhaustion of Remedies
A “contractor must seek the relief provided for under the contract or be barred from any relief in the courts.” Crown Coat Front Co. v. United States, 386 U.S. 503, 512, 87 S.Ct. 1177, 1182, 18 L.Ed.2d 256 (1967). Absent “clear evidence that the appeal procedure is inadequate or unavailable, that procedure must be pursued and exhausted before a contractor can be heard to complain in a court.” United States v. Joseph A. Holpuch Co., 328 U.S. 234, 240, 106 Ct.Cl. 852, 66 S.Ct. 1000, 1003, 90 L.Ed. 1192 (1946).
The parties agreed that breach of contract claims would be subject to the Disputes clause of the contract. Art. XVIII. That clause mandated that if such a claim were not “disposed of by agreement,” then it would be reviewed by NASA’s Associate Administrator for Space Flight. If the Associate Administrator were unable to resolve the dispute within sixty days, then either party could submit a “written appeal” addressed to NASA’s Administrator and New Valley’s President or other appropriate official. A “joint decision” between these two officials would be “final and conclusive.”
New Valley complied with these procedures. By letter dated January 29, 1987, it requested damages from NASA for its alleged breach of the LSA New Valley recognized that the LSA contained a limitation of damages clause, Art. V H 4, but believed that it does not apply when the government breaches or anticipatorily repudiates the agreement. It attached an itemized schedule of losses it sought to recover. NASA reimbursed New Valley for payments made for the unperformed launch and for reservation fees for future launches, two of the line items, but it refused to pay New Valley for the remaining eight items. Both parties reserved “any and all claims or rights [they] may have [had] with respect to damages arising from the LSA.”
Then, in March 1994, New Valley wrote NASA’s Associate Administrator for Space Flight, as prescribed by the Disputes clause, requesting review and resolution of its dispute with NASA. New Valley stated that although NASA had rejected New Valley’s breach of contract claim in 1987, New Valley expressly reserved its claim for damages. It requested that NASA reconsider its 1987 decision in light of Hughes and ASC. Although NASA agreed to reconsider its decision “within the context of the disputes clause,” the Associate Administrator never did. On August 3, 1994, New Valley appealed the unsettled dispute to NASA’s Administrator, via certified letter. In the letter, New Valley noted that except “through judicial resolution, only a joint decision by [Administrator Goldin] and [New Valley] can constitute a final and conclusive resolution of this *1581 dispute.” Consequently, it asked that Administrator Goldin notify New Valley within nine days that he would meet to discuss a resolution or concede liability; otherwise, New Valley would conclude that he was not interested in an administrative resolution, thereby exhausting the Disputes process. No response was forthcoming.
New Valley’s actions facially complied with the procedures required by the Disputes clause. The trial court held otherwise because: (1) the January 29, 1987, letter was not a “written submission” of an unresolved dispute; (2) the March 24 and May 24, 1994, letters did not satisfy the “written submission” requirement because they did not specify the question of fact or law in dispute or the damages sought; (3) the August 3, 1994, letter to Administrator Goldin was not a “written appeal” because (a) there had been no decision by NASA’s Associate Administrator to be appealed, (b) it was not addressed to any New Valley official, (c) it failed to identify the factual or legal question or the damages sought, and (d) it did not purport to seek a final “joint decision.”
The January 29, 1987, letter indicated that New Valley believed NASA had breached or repudiated the LSA, and it attached a list of damages it sought, totaling more than $58 million. NASA ultimately agreed to a refund for two of ten items. It expressly stated, however, that NASA did “not agree that either a breach or a repudiation took place.” New Valley expressly reserved its rights under the LSA. Regardless of whether that letter concerned an existing dispute when submitted, or even whether an existing dispute was a prerequisite, there is no doubt that the parties ultimately disputed whether NASA had breached the LSA[3] New Valley submitted its letter to the Associate Administrator in 1994, after the dispute arose. That letter was unquestionably a written submission of a dispute concerning a question of fact or law; namely, whether NASA had breached the LSA. Additionally, New Valley adequately identified the damages sought. It asked NASA to reconsider its 1987 decision, which rejected all but $4.8 million of New Valley’s request for $58 million in damages. New Valley wanted the remaining $53 million.
On the third issue, New Valley’s August 1994 letter was a written appeal under the Disputes clause. There was no requirement that the Associate Administrator issue a decision on the dispute before New Valley could appeal. The clause stated only that if the Associate Administrator was not successful in resolving the dispute within sixty days after written submission to him, either party may appeal. The Associate Administrator not only was unsuccessful in resolving the dispute within sixty days but apparently made no attempt to resolve it. New Valley was not required to wait any longer to appeal.
As for the appeal itself, it is true that the Disputes clause says that the appeal shall be addressed to NASA’s Administrator and New Valley’s President “or other appropriate official.” While the August 1994 letter was addressed only to Administrator Goldin, it was signed by New Valley’s Assistant General Counsel. In addition to the obvious de minimis nature of this oversight, it is reasonable to believe such an individual was an “appropriate official” to represent New Valley. If the government had any concern about that individual’s authority to act on behalf of New Valley, it could have sought reassurance. Instead, it chose to ignore the letter.
Further, the letter clearly articulated the basis for the appeal. It stated that NASA’s failure and refusal to launch Westar VI-S was a breach of the LSA, the damages for which it requested reimbursement. The letter also stated that the Associate Administrator for Space Flight had failed to resolve the dispute within sixty days of submission; accordingly, it was appealing to Administrator Goldin. There was nothing deficient about the letter.
Finally, New Valley did not simply mandate a favorable decision. It stated that only a joint decision would be final and conclusive. Thus, it requested notice from Ad *1582 ministrator Goldin that he or his representative would meet with New Valley to discuss the dispute or agree that NASA was liable. On the heels of being ignored for more than sixty days, it was not unreasonable for New Valley to seek this notice from NASA. Indeed, it was not as if New Valley mandated that any meeting be held within nine days. It sought only an indication that NASA was willing to meet at some future time. Otherwise, it would assume NASA was not interested in resolving the dispute. Having heard nothing from NASA for almost three months, New Valley filed suit. This was exhaustion of administrative remedies.[4]
B. Termination of the LSA
Under Article VII, the government could terminate the LSA “upon a determination in writing that NASA is required to [tjerminate such services for Reasons Beyond NASA’s Control.” Article XX defined “Reasons Beyond NASA’s Control” to include “acts of the United States Government other than NASA, in either its sovereign or contractual capacity.” The government argues that the President’s 1986 directive, coupled with NASA’s October 30, 1986, letter to New Valley, constituted a termination in accordance with Article VII.
The government’s argument is strained, inconsistent with NASA’s actions, and foreclosed by Hughes and ASC. It never terminated the LSA. Indeed, it was quite adamant that it was not terminating the LSA. In its October 30, 1986, letter to New Valley, the government stated that it was certain only that the launch of Westar VI-S would be “delayed far in excess of the nine-month period described in Article VII”; thus, should New Valley “wish to terminate [the] LSA prior to expiration,” it could “do so based on this delay.” This was not a termination by NASA; it was merely a recognition by the space agency that New Valley was entitled under the LSA to terminate the contract and was an invitation to exercise that right.
Moreover, after New Valley requested damages in its January 29, 1987, letter, NASA responded that its “position [was] that the LSA [wa]s still in existence.” Indeed, it objected to giving New Valley any refund unless New Valley terminated the LSA because “a refund without a termination could be seen as acknowledgment that NASA has in some way terminated” the LSA. NASA could not have been clearer that it was not terminating the contract; indeed, it was endeavoring to avoid even the potential perception that it had terminated the LSA. Thus, the government not only failed to make a written determination that the President’s directive was a reason beyond NASA’s control, requiring it to terminate the agreement, it steadfastly maintained the contrary. Under these circumstances, we cannot hold that the government terminated the contract in accordance with Article VII.
Nor could the government have done so, as the trial court appears to have held. It concluded that the President’s decision to cease launching commercial payloads was a reason beyond NASA’s control, which “allowed” NASA to terminate the contract. The court was careful not to hold that NASA made a written determination that the President’s decision required it to terminate the LSA. We read its opinion to say that notwithstanding NASA’s protestations to the contrary, the government constructively terminated the contract because it could have done so. We disagree.
In Hughes and ASC, the government argued, and the Court of Federal Claims agreed, that the President’s 1986 decision to cease launching commercial payloads was a sovereign act for which the government was not liable. We reversed and remanded, holding that regardless of the sovereign acts doctrine, the contracts shifted responsibility to the government for changes in its launch priority and scheduling policy. 998 F.2d at 958-59 & n. 8. The court’s construction of the LSA in this case cannot be reconciled with ours. The court effectively held that the *1583 same contract[5] that we construed to shift the risk to the government for changes in launch priority and scheduling policy, allows the government to terminate the LSA for such changes. Stated otherwise, the court held that the same policy change for which we held the government was liable under the LSA permits the government to terminate the contract. In Hughes and ASC we left open the possibility that on remand the government might be able to raise “another defense” that might prevail. See 998 F.2d at 959. We did not, however, open the door to a defense that patently conflicts with our construction of the LSA.
C. Waiver
The court relied on two provisions of the LSA in holding that New Valley waived “all judicial claims”: (1) the language of the Disputes clause stating that the joint decision of the NASA Administrator and New Valley’s President, or representative, shall be “final and conclusive”; and (2) Article V, paragraph 4. On the first, it is true that the Disputes clause indicates that the parties intended for any joint decision to be final and conclusive. Such a decision would be barred, then, from judicial review. See Lynch v. United States, 292 U.S. 571, 582, 54 S.Ct. 840, 844-45, 78 L.Ed. 1434 (1934). Here, however, there was no such decision. Without explanation, NASA simply ignored New Valley’s claim. As stated above, New Valley followed the procedures prescribed in the Disputes clause without so much as an acknowledgment from NASA that it had received New Valley’s correspondence. There is simply no joint decision here entitled to the binding “final and conclusive” stamp. Nor does this language reveal an intent by the parties to waive all judicial claims.
Whether Article V, paragraph 4 constitutes a waiver of New Valley’s breach of contract claim is a more difficult question. We rejected this very argument, albeit implicitly, when the government raised it on appeal in Hughes and ASC. We find it equally unpersuasive here.
Article V (Aloeation of Certain Risks) assigns certain risks of liability “arising out of the Launch and Associated Services to be performed by the United States.” A’t. V, H 1(a). The plain language of this provision shows that the scope of Article V is limited to allocating performance risks between the parties. It is not directed to a situation like that before us, where the government failed to perform.
Notwithstanding, paragraph four of Article V addresses “Customer Claims Against the United States” and provides, in part (emphasis and numbering added), that New Valley “[1] shall not make any claim against the United States ... for the non-performance or improper performance of Launch and Associated Services, [2] including, but not limited to, the performance by the United States ... of research, design, development, test, manufacture, assembly, integration, transportation or use of any materials related to STS Operations or in the performance of other services related to STS Operations.” New Valley, relying in part on the stated scope of Article V and in part on the plain language of this provision, argues that this waiver is limited to claims for non-performance of the enumerated operational tasks. However, we find no textual support for this argument.
Clause [1] seems to waive any claim New Valley might have against the government for non-performance of launch and associated services. Because the LSA is “for Launch and Associated Services,” this provision purports to waive any claim that New Valley might have for non-performance of the contract altogether, not just certain services. Clause [2] does not modify or otherwise limit the “non-performance” language of clause [1]. Clause [1] waives claims for both nonperformance of the contract and improper performance. By its terms, clause [2] addresses only potential claims arising out of the government’s performance of the listed operational tasks. Thus, clause [2] offers examples only of improper performance, as opposed to non-performance, of operational *1584 tasks for which the government argues New Valley has waived any claims in clause [1].
Thus, viewed in isolation, paragraph 4 of Article V arguably supports the trial court’s interpretation of the contract as waiving any claim against the government for non-performance of the LSA. In light of the contract’s other provisions and standard rules of contract interpretation, however, that construction cannot prevail. Indeed, we are charged with interpreting the LSA in a manner that preserves its validity, not destroys it. Walsh v. Schlecht, 429 U.S. 401, 408, 97 S.Ct. 679, 685, 50 L.Ed.2d 641 (1977); Maxima Corp. v. United States, 847 F.2d 1549, 1557 (Fed.Cir.1988). Moreover, as an exculpatory provision, we must construe Article V, paragraph 4, narrowly and strictly. See Freedman v. United States, 162 Ct.Cl. 390, 320 F.2d 359, 366-67 (1963).
In this light, it is not surprising that the LSA contained a provision waiving claims New Valley might have against the government for failing to launch its satellite. The parties contemplated that the government, even using its best efforts, might not be able to launch Westar VI-S. In fact, the contract was to expire in September 1995, even if New Valley’s satellites had not been launched. Article V, paragraph 4, simply holds the government harmless if it is unable to launch Westar VI-S, using its “best efforts.”
The gravamen of New Valley’s complaint, however, is not that the government failed to launch Westar VI-S, but that the government breached its obligation to use its best efforts to launch the satellite. Paragraph 68 of its complaint alleges that the government willfully, intentionally, and without a valid basis breached the LSA “by refusing and failing to use its best efforts to launch Westar VI-S.” The LSA does not insulate the government from a claim that it caused New Valley damages by making no, or at most little, effort to launch the satellite, in violation of its contractual obligations.[6] The waiver provision was intended to immunize the government from a claim for non-performance only where it had complied with its contractual duty to use its best efforts, a possibility the parties had contemplated. This narrow interpretation gives reasonable meaning to all terms of the LSA without rendering any superfluous and best effectuates the parties’ intent and the LSA’s “spirit and purpose.” See Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed.Cir.1991).
Indeed, the construction of the trial court and the government would do violence to, and render superfluous, the termination provision set out at Article VII. That provision permits the government to terminate the contract under just four circumstances: (1) war, (2) national emergency, (3) inadequate appropriations for NASA, and (4) a written determination that NASA is required to terminate the LSA for reasons beyond its control. It also sets forth the parties’ respective financial obligations in the event of termination. Construing Article V to permit the government, at its whim, to walk away from the LSA with impunity would render this article meaningless. It would also come perilously close to, if not shove the contract over, the cliff of voidness. See Torncello v. United States, 231 Ct.Cl. 20, 681 F.2d 756, 760 (1982) (“[A] party may not reserve to itself a method of unlimited exculpation without rendering its promises illusory and the contract void.”). It was not as though New Valley had no options when it contracted with NASA: there were other launch facilities it could have chosen but forewent.

Conclusion

Accordingly, the order of the United States Court of Federal Claims dismissing New Valley’s complaint is reversed, and the case is remanded for further proceedings consistent with this opinion.

COSTS

New Valley Corporation shall have its costs.

REVERSED AND REMANDED.

. Citations to Article numbers refer to the Articles contained in the LSA.

. The government concedes that New Valley’s complaint is not barred by the six-year statute of limitations in 28 U.S.C. §§ 2401 and 2501 because New Valley was in Chapter 11 bankruptcy during the relevant period.

. Because the LSA is not a procurement contract subject to the Contract Disputes Act, see 41 U.S.C. § 602(a) (1994), this dispute is not controlled by that act or case law interpreting it.

. In light of NASA's unexplained failure to act on this dispute, the procedures of the Disputes clause also appear to have been unavailable and inadequate, thus authorizing the present action. See Holpuch, 328 U.S. at 239-40, 66 S.Ct. at 1003-04.

. The parties agree that for all intents and purposes the contract at issue here is identical to those before us in Hughes and ASC.

. Of course, we express no opinion on the merits of such a claim.