# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 97-3727MN

_____

| | | |
|---|---|---|
| Franklin High Yield Tax-Free Income Fund, a series of the Franklin Tax-Free Trust, a Massachusetts trust, | * * * * | |
| Appellant, | * * | |
| v. | * * | |
| County of Martin, Minnesota; County of Nicollet; County of Sibley; County of Waseca; County of Watonwan; Jean Burkhardt; Steven Donnelly; Leighton Hugoson; Charlene Kahler; Steven Pierce; Kenneth Albrecht; Judy Hanson; William Schimmel; Clete Schroepfer; Clifford Wenner; John Bach; Leo Bauer; Don Schwecke; Todd Voight; Charles Woehler; George Doyle; James Goettl; Calvin Grams; Ralph Keyes; Robert Peterson; Noren Durheim; Milo Holland; Vernon Koerselman; Lester Reckow; Robert Sorensen, | * * * * * * * * * * * * * * * * | Appeal from the United States District Court for the District of Minnesota. |
| Appellees. | * | |

_____

Submitted: May 13, 1998
Filed: August 13, 1998

_____

Before RICHARD S. ARNOLD, JOHN R. GIBSON, and FAGG, Circuit Judges.

_____

FAGG, Circuit Judge.

In this breach of contract and securities fraud lawsuit, municipal bondholder Franklin High Yield Tax-Free Income Fund appeals the district court's judgment on the pleadings in favor of several counties and their commissioners. We reverse and remand for further proceedings.

We review de novo the district court's decision to grant judgment on the pleadings. See Lion Oil Co. v. Tosco Corp., 90 F.3d 268, 270 (8th Cir. 1996). Judgment on the pleadings is proper when the moving party clearly shows there are no material factual issues and the moving party is entitled to judgment as a matter of law. See id. "Under this strict standard, we accept as true all facts pled by [Franklin] and draw all reasonable inferences from the pleadings in [Franklin's] favor." Id. We present the facts in this light.

To develop rental housing for moderate income and elderly tenants, five Minnesota counties (the counties) created the Southcentral Minnesota Multi-County Housing and Redevelopment Authority (the Authority) and appointed two members each to the Authority's board. After the counties and the Authority established plans for the housing projects, the counties gave the Authority power to raise financing by issuing revenue bonds and to provide additional security for the bonds by guaranteeing funding for potential operating deficits. The guarantee was viewed as necessary to make the bonds attractive to investors. Thus, each county and the Authority signed identical operating deficit agreements (the Agreements) stating that if the Authority projected its revenues would fall short of its costs for an upcoming year, each county would pay its proportionate share to overcome the deficit. The Agreements provided that the Authority would collect each county's share through a special benefit tax levied by the Authority with the county's consent. See Minn. Stat. Ann. § 469.033 subd. 6

(West 1994) ("Subject to the consent by resolution of the governing body" of municipality, authority can levy special benefit tax on municipality's taxable property). Because in the counties' view, § 496.033 subdivision 6 prevented the counties from prospectively approving the Authority's future levy of a special benefit tax, each county agreed "that during the term of this Agreement, the County will use its best efforts to approve the [Authority's] Special Benefit Tax levy . . . and the County represents that it reasonably expects to give such approvals to the [Authority]. The County further represents that it presently intends and expects that such levy will be approved."

The Authority issued the bonds in May 1993 under a trust indenture that incorporated the Agreements as additional security for the bonds. To inform potential investors about the bonds, the Authority issued an official statement emphasizing that each county had agreed to use its best efforts to approve a tax levy to cover operating deficits. Although the Agreements did not say so, the statement cautioned that the Agreements did not bind the counties to levy taxes and that the counties retained power to reject a levy "for any reason whatsoever." A few days later, the county attorney for each county issued an opinion letter confirming that the Agreement was a "valid and legally binding obligation of the County." Relying on the Agreements, Franklin bought half of the bonds at a cost of $10 million. Individual investors purchased the rest.

The housing project did not fare well. The Authority projected an operating deficit for 1996 and sought the counties' approval of a $516,876 tax levy. Although each county's board of commissioners was the same as when the counties entered into the Agreements, each county board unanimously voted to deny the levy request after the commissioners communicated with each other about it. According to Franklin's allegations, "none of the counties made any effort whatsoever to approve the levy." Indeed, Franklin alleges the counties engaged in a concerted effort to deny the levy and to avoid the Agreements' obligations. For example, when an Authority representative attended one county board meeting to provide information about the projected shortfall, the board cut his presentation short and voted to deny the request before the

representative could ask for approval. Before the Authority's meetings with the other four counties, officials from the first county contacted the other four counties' officials and urged them to deny the levy request, and sent a letter stating the commissioners had no legal obligation to pledge tax dollars for the project. In denying the levy request, each county gave a similar explanation, stating that it would not approve the request because the other counties would not or had not done so.

As a result of the levy denial, Moody's Investor Service downgraded the bond ratings, stating the counties' refusal to approve the levy "contradicts the position they took at the time the issue was brought to market . . . disregarding the concept and spirit behind the operating deficit agreement" and representing "a significant retreat from a position which was an important security feature of the [Authority's] bond issue." A few months later, the housing project went into receivership so that project revenues would go first to payment of operating costs rather than to pay bondholders.

In its lawsuit, Franklin alleges the counties breached the Agreements by failing to use their best efforts to approve the levy. Franklin also alleges fraud claims under state and federal securities laws. The district court dismissed Franklin's breach of contract claim, concluding the Agreements "cannot be read to require the Counties, in their legislative capacity, to approve the levy request," and the best efforts clause was satisfied by the counties' executive function merely recommending the levy to the legislative function. In the district court's view, all of Franklin's claims sought "to impose liability on the ground that the counties failed to approve the levy request, despite the fact that the counties reserved the right to deny such requests." Thus, the district court held Franklin could not justifiably rely on the best efforts clause in the Agreements. Because justifiable reliance is an essential element of Franklin's fraud claims, the district court dismissed them.

Franklin asserts the district court's construction of the Agreements' best efforts clause is inconsistent with its plain terms, with the intent of the parties, and with the

judicial canon preferring an interpretation that gives a contract meaning over another that makes it meaningless. We agree. Even if the counties retained the right to deny a levy, which the Agreements do not expressly say, the counties' promise to use their best efforts to approve a levy is not meaningless, as the district court essentially held. See New Valley Corp. v. United States, 119 F.3d 1576 (Fed. Cir. 1997). The counties' denial of a levy would not violate the Agreements if the counties used their best efforts, but in the absence of best efforts, the counties' denial of a levy breaches the contracts. See id. at 1584. This interpretation of the Agreements gives reasonable meaning to all terms without rendering the best efforts clause meaningless, and best effectuates the parties' intent and the contracts' spirit and purpose. See id.; see also Simeone v. First Bank N.A., 971 F.2d 103, 107 (8th Cir. 1992) (courts prefer interpretation of contract language that does not render performance impossible or meaningless). The best efforts provision was adopted after years of study, was part of resolutions adopted after public hearings, and was touted to bond ratings agencies and buyers as the critical security behind the bonds. The Agreements contain no language contradicting the best efforts promise or reserving discretion to deny a levy "for any reason whatsoever." Under these circumstances, we conclude the parties intended for the best efforts clause to have some legally enforceable meaning.

Contrary to the district court's view, the counties did not satisfy the best efforts obligation as a matter of law. Given Franklin's allegations that the counties used no effort to approve the levy and, in fact, encouraged each other to deny the levy, a reasonable jury could conclude the counties' actions breached the best efforts provision. See Hillside Enters. v. Carlisle Corp., 69 F.3d 1410, 1415 (8th Cir. 1995); United Telecomm., Inc. v. American Tel. & Communications Corp., 536 F.2d 1310, 1319 (10th Cir. 1976). The pleadings reflect no extenuating circumstances for denying the levy. Indeed, Franklin alleges the commissioners voted to reject the levy because they believed they weren't legally obligated to approve it and the levy would make them unpopular with constituents. The same commissioners signed the Agreements, however, which stated they "reasonably expect[ed]" to approve a levy.

With respect to Franklin's fraud claims, the district court held Franklin's reliance on the counties' promises to use their best efforts was not justified. See Davidson v. Wilson, 973 F.2d 1391, 1400-01 (8th Cir. 1992) (justifiable reliance is essential element of a securities fraud claim). Franklin contends the district court misunderstood the basis of its fraud claims. We agree. It appears the district court incorrectly assumed Franklin's fraud claims were premised on the counties' contractual promises to use their best efforts in the future, when the pleadings make clear that Franklin's claims are based instead on the representations of the counties' intentions and expectations when they signed the Agreement in 1993. In the Agreement, each county represented it "presently intends and expects that [the] levy will be approved." Franklin alleged this representation was knowingly or recklessly false when made.

Allegations that defendants made specific promises to induce a securities transaction while secretly intending not to carry them out and later not carrying them out are sufficient to state a claim for relief under federal securities law, see Luce v. Edelstein, 802 F.2d 49, 56 (2d Cir. 1986), and the law of Minnesota, see Stock v. Heiner, 696 F. Supp. 1253, 1261 (D. Minn. 1988). The bespeaks caution doctrine does not doom securities fraud claims based on statements of present intention that are untrue when made. See Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1213 (1st Cir. 1996). We conclude the district court should not have dismissed Franklin's fraud claims.

The counties contend dismissal of the fraud claims was proper for an alternative reason--because Franklin did not adequately allege loss causation, that is, a connection between the counties' allegedly fraudulent conduct and Franklin's monetary loss. See Harris v. Union Elec. Co., 787 F.2d 355, 366 (8th Cir. 1986) (defining loss causation). Under our broad test for loss causation, however, Franklin only needed to allege some causal connection between the counties' improper conduct and Franklin's losses. See Arthur Young & Co. v. Reves, 937 F.2d 1310, 1332 (8th Cir. 1991) (later history omitted). In its complaint, Franklin generally alleged that it purchased the bonds in

reliance on the promises and representations contained in the Agreements, and because of the counties' fraud and breach, the bonds diminished in value and are in default. Franklin also alleged the counties misrepresented the security underlying the bonds, Franklin would not have purchased the bonds absent those misrepresentations, and as a result of the purchase, Franklin suffered damages in an amount equalling the difference between the inflated price paid as a result of the misrepresentations and the bonds' actual value at the time of issuance. In other words, Franklin asserted the counties made fraudulent misrepresentations and those misrepresentations brought about its damages. See Caremark, Inc. v. Coram Healthcare Corp., 113 F.3d 645, 649 (7th Cir. 1997) (holding this assertion sufficiently alleges loss causation). We conclude Franklin sufficiently alleged the counties' misrepresentations proximately caused its injuries. See Reves, 937 F.2d at 1332.

We reverse the district court's order granting judgment on the pleadings and remand for further proceedings.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-7-