**TURNTABLE FISHERY & MOORAGE CORP., et al., Plaintiffs,**

v.

**THE UNITED STATES, Defendant.**

No. 01–110C.

United States Court of Federal Claims.

April 10, 2002.

Herman H. Fitzgerald, Burlingame, CA, for plaintiffs.

Allison A. Page, Washington, DC, with whom was Assistant Attorney General Robert D. McCallum, Jr., for defendant.

## *OPINION*

MILLER, Judge.

This case is before the court on defendant's motion under RCFC 12(b)(4) to dismiss plaintiffs' second amended complaint for failure to state a claim. At issue is whether a private club and its members can state a claim for a taking in contravention of the Fifth Amendment of the U.S. Constitution when plaintiffs built physical facilities on federal land pursuant to special-use permits and when the Government allegedly induced plaintiffs to transfer those facilities to another permit holder and to enter lease agreements with that entity. Argument is deemed unnecessary.

## FACTS

The following facts are taken from plaintiffs' second amended complaint.[1] Turntable Fishery & Moorage Corporation, f/k/a Shasta Lake Boat & Yacht Club ("plaintiff Turntable"), is a California, non-profit corporation comprised of 74 shareholders who also sue in their individual capacities (the "individual plaintiffs"). By virtue of special-use permits granted by the United States Department of Agriculture Forest Service (the "Forest Service"), plaintiff Turntable since 1945 has enjoyed certain real and personal property interests in the federally-owned real property known as Turntable Bay Annex, on Lake Shasta in the Shasta–Trinity National Forest, California ("Turntable Bay"). Pursuant to these permits, plaintiff Turntable constructed physical facilities, both on land and water, access roads, private docks, launch ramps, a caretaker's residence, a parking lot, and storage areas. These facilities were owned and maintained for the exclusive use of plaintiff Turntable and its members. As

---

1. Plaintiffs' original complaint consisted of nine counts. In an unpublished order, the court dismissed two counts on the merits and six for lack of jurisdiction. *See Turntable Fishery & Moorage Corp. v. United States*, No. 01–110C (Fed.Cl. Aug.23, 2001). The original complaint appended many documents, only two of which are attached to plaintiffs' second amended complaint. The court, in this opinion, has identified those documents that the parties rely upon in their arguments and deems them part of the second amended complaint. *See* RCFC 10(c). Unless otherwise indicated, "complaint" herein refers to the second amended complaint.

explained in the documents attached to plaintiffs' original complaint, before 1980 only plaintiff Turntable held a special-use permit. In 1980 the Forest Service required the individual plaintiffs, each of whom had built individual boathouses on the land occupied by plaintiff Turntable, to obtain permits themselves.

On December 5, 1994, the Forest Service informed plaintiffs that it would be eliminating exclusive-use permits at Turntable Bay and opening the site to the general public. Plaintiffs allege that, on or about January 1995, the Forest Service advised plaintiffs that they could remain at Turntable Bay until such time as the property was open to the public, on the condition that plaintiff Turntable transfer its common facilities to Larry McCracken, d/b/a Antlers Resort & Marina, Inc. ("Antlers Resort"). According to plaintiffs, Antlers Resort is a commercial marina and resort facility also located on Turntable Bay. Plaintiffs allege that the Forest Service required the transfer so that Antlers Resort would operate Turntable Bay as a public, rather than private, park.

Plaintiff Turntable nevertheless unsuccessfully attempted to renew its special-use permit when it expired in 1996.[2]  On August 5, 1996, it entered into an Agreement for Transfer of Assets (the "Transfer Agreement") with Antlers Resort, whereby plaintiff Turntable transferred all of its improvements at Turntable Bay. The transferred assets allegedly were worth $750,000.00.

The individual plaintiffs subsequently entered into individual Boathouse Moorage Leases (the "Moorage Leases") with Antlers

Resort on October 1, 1996.  The leases were to expire in 2018, the year that Antlers Resort's own use permit was to expire.  An affidavit filed with plaintiffs' original complaint recites that the Forest Service previously had informed the individual plaintiffs in September 2000 that it was redeveloping Turntable Bay and planned to remove all existing facilities by June 30, 2001.  Plaintiffs allege that the individual plaintiffs entered the Moorage Leases because the Forest Service represented that the leases would entitle them to exclusive use of Turntable Bay until such time as the site was redeveloped.

On March 19, 2001, Antlers Resort wrote to the individual plaintiffs ordering the removal of their boathouses and explaining that the Forest Service had forced it to terminate their leases.[3]  In order to block the impending removal of their boathouses, plaintiffs filed a motion for a preliminary injunction. On April 3, 2001, this court denied plaintiffs' attempt to obtain a preliminary injunction. The second amended complaint, however, does not elaborate on events after that date. The complaint does not reveal whether the Government has yet condemned Turntable Bay.

Plaintiffs allege that an inverse condemnation in contravention of the Fifth Amendment to the U.S. Constitution took place when the Forest Service required plaintiff Turntable to enter the Transfer Agreement and when it caused the termination of the individual plaintiffs' Moorage Leases, because the Government thereby took plaintiffs' property without initiating legal con-

---

2. A letter from the Forest Service dated September 25, 2000, and attached to the original complaint, states that the permits of both plaintiff Turntable and the individual plaintiffs expired on December 31, 1994.  Per that letter the Forest Service already had told plaintiffs of its desire to open Turntable Bay to the public on December 31, 1979, when plaintiff Turntable's second use permit expired, but nevertheless agreed to allow plaintiffs exclusive use until December 31, 1989, in recognition of the fact that plaintiffs had invested in the construction of common facilities. In 1990 those permits were renewed until December 31, 1994.  The record does not disclose, however, whether plaintiffs were issued any special-use permits after that date.

3. In their second amended complaint, plaintiffs allege that it was "defendant" who wrote to plaintiffs informing them of the condemnation and terminating their leaseholds pursuant to the condemnation provision of the Moorage Leases. The United States, however, does not appear as a party on the representative lease attached to the complaint.  According to a letter to plaintiffs dated March 19, 2001, and attached to plaintiffs' response brief, it was Antlers Resort that notified plaintiffs of the upcoming condemnation and then terminated the Moorage Leases.  This document is consistent with the affidavit attached to plaintiffs' original complaint, which also attests that it was Antlers Resort, not the Government, that terminated the leases of the individual plaintiffs.

demnation procedures. Plaintiffs further allege various interim economic losses, and "interim" interference with their use, enjoyment, marketability, and other attributes of ownership due to the six-year delay between the Government's announcement of its plan and the actual condemnation of Turntable Bay, which, according to plaintiffs, constitutes a purposeful attempt by the Forest Service to depress their property value at the time the condemnation.[4] Plaintiffs seek compensation of at least $1,500,000.00, representing the value of their collective interests in Turntable Bay, as well as an unspecified amount of compensation attributable to the Government's delay in actual acquisition, attorneys' fees, costs, and expenses.

Defendant now moves to dismiss under RCFC 12(b)(4) for failure to state a claim upon which relief can be granted, arguing that the Government's acquisition of Turntable Bay did not amount to a taking and that plaintiffs, in any case, cannot claim a compensable property interest in the facilities at Turntable Bay.

## DISCUSSION

When a federal court reviews the sufficiency of the complaint, it follows "the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *accord New Valley Corp. v. United States,* 119 F.3d 1576, 1579 (Fed. Cir.1997). Under RCFC 12(b)(4), the court must accept as true the facts alleged in the complaint, *Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, 633, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999), and must indulge all reasonable inferences in favor of the nonmovant, *Henke v. United States,* 60 F.3d 795, 797 (Fed.Cir.1995). Therefore, a motion under RCFC 12(b)(4) must be denied if relief can be granted "under any set of facts that could be proved consistent with the allega-

tions." *NOW v. Scheidler,* 510 U.S. 249, 256, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994).

The Fifth Amendment to the U.S. Constitution mandates that no "private property be taken for public use, without just compensation." The determination of when the Government has taken private property "for public use" and when a property owner is entitled to "just compensation" is a factual and difficult one. *See generally Penn Cent. Transp. Co. v. New York City,* 438 U.S. 104, 123–28, 98 S.Ct. 2646, 57 L.Ed.2d 631 (reviewing factors shaping Fifth Amendment takings jurisprudence); *Yuba Goldfields, Inc. v. United States,* 723 F.2d 884, 887 (Fed. Cir.1983) (explaining that "the law of just compensation is hardly a matter of clarity"), *rev'd sub nom. on other grounds, Yuba Natural Resources, Inc. v. United States,* 821 F.2d 638 (Fed.Cir.1987). Nevertheless, "[s]ummary dismissal of a taking claim is appropriate where the circumstances alleged in the complaint, even if taken as true and all reasonable inferences are drawn in favor of the plaintiff, cannot establish that a taking has occurred." *Atlas Corp. v. United States,* 895 F.2d 745, 757 (Fed.Cir.1990).

Plaintiffs assert that the facts in the complaint support both a *"per se"* physical taking of their property or, alternatively, a regulatory taking. The Government's action is characterized as a physical taking when it authorizes physical occupation of a plaintiff's property (or actually takes title), as compared to a regulatory taking where the Government merely regulates the use of that property. *Yee v. City of Escondido,* 503 U.S. 519, 522–23, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992); *see also Penn Cent.,* 438 U.S. at 124, 98 S.Ct. 2646. The distinction is important, for "[t]he first category of cases requires courts to apply a clear rule; the second necessarily entails complex factual assessments of the purposes and economic effects of government actions." *Yee,* 503 U.S. at 523, 112 S.Ct. 1522; *see also Loveladies Harbor, Inc. v. United States,* 28 F.3d 1171, 1180–82 (Fed.Cir.1994). In either scenario

---

4. It does not appear to be plaintiffs' contention, however, that they have a claim for a temporary taking due to the delay alone. *See, e.g., Tabb Lakes, Ltd. v. United States,* 10 F.3d 796, 803

(Fed.Cir.1993) (noting that taking may occur by reason of "extraordinary delay in governmental decisionmaking").

plaintiff first must possess a valid interest in the property affected by the governmental action. *Bay View, Inc. v. United States,* 278 F.3d 1259, 1263 (Fed.Cir.2001); *Wyatt v. United States,* 271 F.3d 1090, 1096 (Fed.Cir. 2001) ("It is axiomatic that only persons with a valid property interest at the time of the taking are entitled to compensation."). The plaintiff must possess a compensable property interest before the court can proceed to determine whether the alleged governmental action constitutes a taking of that interest. *Bay View,* 278 F.3d at 1263; *M & J Coal Co. v. United States,* 47 F.3d 1148, 1154 (Fed. Cir.1995).

### 1. *Property interest*

#### 1) *Plaintiff Turntable*

■ Plaintiffs do not allege that Forest Service's refusal to renew their special-use permits constitutes a taking. Rather, they maintain that a taking occurred because the Government induced conveyance of their property to Antlers Resort for the purpose of opening that property to the public and because the Government caused the termination of the Moorage Leases. Because certain of plaintiffs' property is claimed as "real" property and because the terms of plaintiffs' permits expressly stated that the permit did not grant any permanent possessory interest in real property, defendant argues that plaintiffs held no compensable property interest in any real property that was transferred to Antlers Resort. Although the determination of whether property rights exist properly is made with reference to state law, *see Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1001, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984), where a plaintiff's property rights are created by a permit from the Government, the terms of that permit define whether the plaintiff enjoys a compensable property interest within the meaning of the Fifth Amendment. *See Del–Rio Drilling Programs v. United States,* 146 F.3d 1358, 1364 (Fed.Cir.1998); *see also Bay View,* 278 F.3d at 1264; *Alves v. United States,* 133 F.3d 1454, 1457 (Fed.Cir.1998).

■ The permit referred to by defendant, however, does not define plaintiffs' property interests. It is a 1997 special-use permit issued by the Forest Service to Antlers Resort and to which neither plaintiff Turntable nor the individual plaintiffs are parties. According to the use permits attached to plaintiffs' original complaint, plaintiff Turntable was issued a permit in 1948 to occupy Turntable Bay and to construct a floating dock, caretaker's cottage, club house, sanitation facilities, water system, telephone and electric power lines, and a marine maintenance and repair shop. Whether characterized as real or personal property, these improvements were recognized to be the property of plaintiff Turntable, as evidenced by the fact that the 1948 permit expressly stated that the Government would pay plaintiff Turntable for buildings and improvements "in the event public interest requires public ownership thereof." The renewed permit, granted in 1959, also supports the conclusion that plaintiff Turntable has a property interest in the facilities that it constructed:

> 11. Upon abandonment, termination, revocation, or cancellation of this permit, the permittee shall remove within a reasonable time all structures and improvements except those owned by the United States, and shall restore the site, unless otherwise agreed upon in writing or in this permit. If the permittee fails to remove all such structures or improvements within a reasonable period, they shall become the property of the United States, but that will not relieve the permittee of liability for the cost of their removal and the restoration of the site.

Even though plaintiff Turntable's permit was allowed to expire, plaintiff Turntable has a compensable property interest in the structures and improvements that it furnished pursuant to that permit. Defendant's observation that plaintiff Turntable subsequently transferred its property interest to Antlers Resort misses the point. Plaintiffs allege that the taking occurred when the Government induced plaintiff Turntable to transfer that property interest. The court therefore examines plaintiff Turntable's property interest at the time of the alleged taking, not at the time of the instant litigation.

### 2) *Individual plaintiffs*

■ Although plaintiffs allege that between 1980 and 1996 the individual plaintiffs also were issued special-use permits by the Forest Service, the record does not include a representative permit. It does appear from the pleadings, that by the terms of those permits, the individual plaintiffs were allowed to construct and/or maintain individual boathouses. Indeed, defendant does not quarrel with the title to the boathouses held by the individual plaintiffs. Plaintiff's allegation is supported by the September 25, 2000 letter from the Forest Service attached to the original complaint, which memorializes the terms of the individual plaintiffs' special-use permits. According to that letter: "In 1990 the District Ranger exercised the option to authorize the continued use by [plaintiffs] for an additional five years, *providing* that all the facilities, including the individual owned boathouses, would be removed from National Forest lands and waters by December 31, 1994." For reasons similar to that of plaintiff Turntable, the individual plaintiffs enjoy a property interest in their boathouses.

■ Nevertheless, plaintiffs do not appear to allege that the Government deprived the individual plaintiffs of their property interest in their boathouses, which were not alleged to be transferred to Antlers Resort. The complaint alleges only that the Government conditioned continued use of the boathouses upon the individual plaintiffs entering the Moorage Leases with Antlers Resort. In fact, plaintiffs assert in their opposition only that the individual plaintiffs can establish a leasehold interest, as defined by California law, and it is that leasehold interest that was taken through the mechanism of inverse condemnation. A leasehold interest is a property interest for purposes of the Fifth Amendment. *Hughes Comm. Galaxy, Inc. v. United States,* 271 F.3d 1060, 1070 (Fed. Cir.2001); *see also First English Evangeli-*

*cal Lutheran Church v. County of Los Angeles,* 482 U.S. 304, 319, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987) (discussing valuation of leasehold interest).

■ The complaint establishes that the individual plaintiffs enjoy a leasehold interest limited to moorage rights. According to the facts as pleaded, however, plaintiffs cannot state a claim for a taking of these leasehold interests. In order to constitute a taking, the Government must interfere with a party's reasonable investment-backed expectations. *Ruckelshaus,* 467 U.S. at 1005, 104 S.Ct. 2862. "A reasonable investment backed expectation must be more than a 'unilateral expectation or an abstract need.'" *Id.* at 1005–06, 104 S.Ct. 2862 (quoting *Webb's Fabulous Pharmacies v. Beckwith,* 449 U.S. 155, 161, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980)). The investment-backed criterion limits recovery to those who can show they acquired a property interest in reliance on the non-existence of a possible condition. *Forest Properties, Inc. v. United States,* 177 F.3d 1360, 1365 (Fed.Cir.1999); *Creppel v. United States,* 41 F.3d 627, 632 (Fed.Cir.1994). A plaintiff entering a private agreement with knowledge of possible restrictions on property hardly can be said to have been denied a reasonable expectation when those restrictions materialize. *Loveladies Harbor,* 28 F.3d at 1177 (legally, purchaser with knowledge of restraint lacks reliance interest and, economically, purchase price reflects value of property with restraint); *Golden Pacific Bancorp. v. United States,* 15 F.3d 1066, 1073–74 (Fed.Cir.1994) (knowledge of pervasive regulatory scheme precludes reasonable expectation that insolvent bank would not be taken by Government); *Ciampitti v. United States,* 22 Cl.Ct. 310, 314, 321–22 (1991) (property owner who purchased knowing development permit "was virtually impossible to get" had no reasonable investment-backed expectations).[5]

---

**5.** Although not fatal to the complaint, plaintiffs do not allege a finding that their leasehold interest had a compensable value. *See Alamo Land & Cattle Co. v. Ariz.,* 424 U.S. 295, 304, 96 S.Ct. 910, 47 L.Ed.2d 1 (1976) ("Ordinarily, a leasehold interest has a compensable value whenever the capitalized then fair rental value for the remaining term of the lease, plus the value of any

renewal right, exceeds the capitalized value of the rental the lease specifies."), *cf. id.* at 304, 96 S.Ct. 910 ("[A] number of factors, of course, could operate to eliminate the existence of compensable value in the leasehold interest."); *Del-Rio Drilling,* 146 F.3d at 1364–65 (property interest may not be compensable when encumbered by statutory or contract terms). The court has

■ According to the Moorage Leases, the leasehold consisted of "moorage for Tenant's boat house." As pleaded, at the time the leasehold interest was established, the Government already had ordered the removal of the individual boathouses, which were allowed to remain on the property until the time of redevelopment. Plaintiffs allege that they not only knew of the Forest Service's plans to discontinue plaintiffs' exclusive rights to Turntable Bay as early as 1979, but also that they knew of the Forest Service's plans physically to redevelop Turntable Bay prior to the time they entered the Moorage Leases. They knew, moreover, that the Government's target date for redevelopment was June 30, 2001. Indeed, plaintiffs' claim is that the Forest Service induced them into the Moorage Leases with the promise that the individual plaintiffs could enjoy exclusive use "until the site is developed for another purpose." Pls.' Second Amended Compl., ¶ 9. In short, plaintiffs allege that their individual permits expired, that the individual plaintiffs thereby had a right and an obligation to remove their boathouses, but that the Forest Service allowed the boathouses to remain on federal property for plaintiffs' exclusive use until such time as Turntable Bay was redeveloped, targeted for June 2001, provided that they enter the Moorage Leases with Antlers Resort. Given these facts, plaintiffs credibly cannot allege that they nevertheless maintained a reasonable investment-backed expectation in moorage rights until the expiration of the Moorage Leases in 2018.

### 2. Government conduct

The individual plaintiffs thus enjoy a compensable property interest only in their boathouses, and plaintiff Turntable, in its common facilities. The limited nature of plaintiffs' property interests affects the court's analysis of the Government's conduct. While plaintiffs have compensable property interests in the facilities that they constructed, at no time have plaintiffs enjoyed the unfettered right to maintain that property on federal land. By the terms of their special-use permits, upon expiration, plaintiffs enjoyed only the right and the obligation, as property owners, to remove that property. Therefore, the only taking of plaintiffs' property that could occur following the expiration of a permit would be the Government's refusing to allow plaintiffs to remove their property within a reasonable time and co-opting that property for public use. To survive a motion to dismiss, therefore, the complaint must be fairly read to allege that the Government's inducement of the Transfer Agreement with Antlers Resort, and the subsequent condemnation of the property, constituted such a refusal and that the individual plaintiffs similarly were denied the right to remove their boathouses before condemnation.

■ A physical taking occurs where the Government requires a property owner to submit to the physical occupation of that property, *Yee*, 503 U.S. at 527, 112 S.Ct. 1522, whether by itself or through a third party, *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 433, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982); *Preseault v. United States*, 100 F.3d 1525, 1551 (Fed.Cir. 1996) (en banc). "A physical occupation of private property by the government which is adjudged to be of a permanent nature is a taking, and that is true without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner." *Hendler v. United States*, 952 F.2d 1364, 1375 (Fed.Cir.1991). A regulatory taking occurs when the Government prevents the landowner from making a particular use of the property that would otherwise be permissible. *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1014, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992); *Forest Properties*, 177 F.3d at 1364. To state a claim for a regulatory taking, a plaintiff must allege facts to support that the character of the Government's conduct and its economic impact interfered with plaintiff's reasonable investment-backed expectations. *Ruckelshaus*, 467 U.S. at 1005, 104 S.Ct. 2862; *Good v. United States*, 189 F.3d 1355, 1360 (Fed.Cir.1999). Plaintiffs do not elaborate as to how the Government accomplished either type of taking, asserting only that it occurred

no basis to infer such a value from the facts alleged in the complaint.

by "a totality of unreasonable activities." Pls.' Br. filed Feb. 19, 2002, at 15.

■ The facts alleged do not state a claim for a physical taking of either plaintiff Turntable's common facilities or of the individual plaintiffs' boathouses. The "element of required acquiescence is at the heart of the concept of occupation." *FCC v. Fla. Power Corp.*, 480 U.S. 245, 252, 107 S.Ct. 1107, 94 L.Ed.2d 282 (1987); *see also Yee*, 503 U.S. at 527–28, 112 S.Ct. 1522 (Government must itself occupy property or require submission to another's occupation); *Forest Properties*, 177 F.3d at 1364–65 (Government did not require submission to occupation when its denial of permit triggered reversionary clause in deed). Although plaintiffs allege that the Government induced them to transfer plaintiff Turntable's common facilities, the facts as pleaded do not support a claim that plaintiffs were compelled to do so. The only property right enjoyed by plaintiffs at the time of the transfer was the right to remove the improvements that they had built. According to the complaint, when the time came for plaintiff Turntable to remove those improvements, "the United States advised Plaintiffs that they could remain on the subject property until Turntable Bay is opened to the public on condition that Plaintiffs transfer their title." Pls.' Compl. filed Nov. 13, 2001, at ¶ 8. Although plaintiffs allege they received no compensation from Antlers Resort upon the transfer, they do acknowledge that they entered the Transfer Agreement "[a]s consideration for the continued use of Turntable Bay." *Id.* at ¶ 9. Because plaintiff Turntable enjoyed no right to keep its facilities on federal land past the expiration of its permit, plaintiffs hardly can maintain that the subsequent transfer of its assets, in consideration for the continued use of those facilities on federal land, constitutes compelled acquiescence to the transfer of their property interests.[6]

■ As for the individual plaintiffs, the amended complaint is devoid of facts to show that they have been deprived of a property interest in their boathouses. Although the complaint alleges that the Government has announced an intention to condemn Turntable Bay, it does not disclose whether condemnation proceedings actually have occurred. Of more importance, plaintiffs do not allege that the Government deprived the individual plaintiffs of a reasonable opportunity to remove their boathouses, and, consequently, the complaint fails to state a claim upon which relief can be granted. The court would reach the same conclusion even if it had found that the individual plaintiffs enjoyed reasonable investment-backed expectations in their leasehold moorage rights. Those expectations would have been limited to the reasonable expectation that the individual plaintiffs would enjoy exclusive moorage rights until such time as redevelopment occurred. The Government acted consistently with those expectations.

For the same reasons, plaintiffs have not alleged that either plaintiff Turntable or the individual plaintiffs were limited in their use of their property so as to constitute a regulatory taking. At no time during the term of plaintiffs' exclusive-use permits do plaintiffs allege that the Government denied or conditioned plaintiffs' exclusive use of their own property or their exclusive access to Turntable Bay. As to the individual plaintiffs, they

---

6. Although argued by defendant, the court does not reach this conclusion in reliance on *Forest Properties*. In that case the plaintiff developer had acquired the right to fill in part of a lake. The deed granting it that right contained a reversionary clause mandating reversion of the lakebottom to a municipal water district if the improvements were not accomplished within three years. Plaintiff sued for a taking when the United States denied it necessary permits, making it impossible for the plaintiff to construct the improvements in the agreed time frame. The Federal Circuit held, *inter alia*, that the reversion, found in "the prior contractual arrangement between [plaintiff] and the water district for such a reversion" was not attributable to the Government. 177 F.3d at 1365. Defendant thus concludes that, "[j]ust as in the *Forest Properties* case, plaintiffs in this case, entered into a private agreement to transfer their property to Antlers" and therefore cannot state a claim for a taking. Def.'s Br. filed Jan. 18, 2002, at 9. Defendant, however, does not elaborate on the basis for this conclusion. The Transfer Agreement is not a "prior contractual arrangement" and plaintiffs' claim that the Government wrongfully induced them to enter the agreement by which they lost their property presents a different scenario from that in *Forest Properties*.

nevertheless continued to enjoy exclusive use even after their permits expired, pursuant to the Forest Service's promise that they could maintain their boathouses until such time as redevelopment occurred. Although it appears that Antlers Resort opened Turntable Bay's common facilities to the public, plaintiffs do not allege that, prior to redevelopment, the Government interfered with the exclusive use of their boathouses or their exclusive moorage rights. Moreover, plaintiffs do not maintain that the Government at any time has interfered with their right to remove those boathouses. As to plaintiff Turntable, it should be clear from the foregoing discussion that the fact that the Government conditioned plaintiff Turntable's continued use of its commonly owned facilities on their transfer to Antlers Resort for public use is irrelevant when plaintiff Turntable had no right to maintain those facilities on federal land at the time of the transfer.

## CONCLUSION

Accordingly, based on the foregoing, defendant's motion to dismiss plaintiffs' second amended complaint pursuant to RCFC 12(b)(4) is granted, and the Clerk of the Court shall dismiss the second amended complaint.

**IT IS SO ORDERED.**